JANE DOE, individually, and on behalf of
all others similarly situated,

             Plaintiffs,

v.

CIN-LAN, INC. and DEJA VU
CONSULTING, INC.,

             Defendants.

_____/

Case No. 08-cv-12719

HONORABLE STEPHEN J. MURPHY, III

## ORDER

### INTRODUCTION

The plaintiff in this putative class action is claiming that, because she qualifies as an "employee" within the meaning of the Fair Labor Standards Act, she is entitled to a minimum wage and other benefits and protections enumerated in that statute. In a motion for preliminary injunction before the Court, she claims that in response to her filing of the present lawsuit the defendant has constructively discharged her from her job, and she therefore seeks preliminary relief under the anti-retaliation provisions of the FLSA requiring the defendant to treat her no differently from the rest of its workers.

### BACKGROUND

I. Facts

    A. The Underlying Claims

Defendant Cin-Lan, Inc. runs a chain of nightclubs "offering live, nude, semi-nude and/or clothed entertainment to the adult public." Response brief, docket no. 14, at p. 2. From approximately June 2007 until July 1 of this year, plaintiff Doe performed as a nude

dancer at one of Cin-Lan's "Deja Vu" clubs, located in Lansing, Michigan (hereinafter "the club"). Compl. at ¶ 5. It appears that dancers at Cin-Lan's clubs are paid in two different ways. First, the club itself announces the amount (hereinafter a "dance fee") that a customer must hand over to a dancer in order to receive various kinds of dances. Second, during or after a dance -- either a private dance for which a dance fee was paid, or a dance on the club's main stage for which no fees are charged -- the spectators usually tip the dancer (hereinafter, a "dance tip").

At the heart of Doe's retaliation claim is the treatment of her dance fees. Cin-Lan maintains forms indicating that a new dancer at any of its clubs may choose whether to be an "independent contractor" or an "employee."[1] The forms state that independent contractor nude dancers will rent space in Cin-Lan's clubs to perform the dances for which their customers pay, and in exchange will remit to the club a certain portion -- usually 30 to 40 percent -- of the dance fees they collect. The balance of the dance fees are retained by the dancer and treated by Cin-Lan as her "independent contractor" income. Cin-Lan never physically receives these funds or records them in its records, and thus never makes any income tax or other withholdings from them on behalf of the dancers. Independent contractor dancers also have the freedom to choose what to wear while performing, what kind of performances in which to engage, and whether to accede to any given customer's request for a performance.

---

[1] Defendants have submitted two slightly different versions of what they claim is Cin-Lan's "Dancer Performance Lease." Docket no. 14, ex. C, and docket no. 36, ex. A. Unless otherwise noted, the two leases are identical.

By contrast, the forms provide that a dancer who chooses to be an "employee" will receive a minimum wage and other benefits required by the employment laws, as well as dance training, but the dancer will further be required to turn over to Cin-Lan the entirety of the dance fees she collects. Further, she will be subject to the direction of club management as to what to wear, how to dance, and who to dance for, as well as in performing non-dancing activities such as serving drinks or cleaning the club, and will be required to sign a non-competition agreement permitting her to dance only at Cin-Lan's clubs. Cin-Lan represents that no dancer in recent memory has chosen to be treated as an employee. This is apparently because a large portion of a nude dancer's income is derived from dance fees, and to become an employee one must agree to exchange those fees for nothing more than the minimum wage (plus statutory benefits), in addition to subjecting oneself to more onerous working conditions.

Although the record does not disclose Doe's precise income from dancing, it seems to have been substantial. The receipts Doe attached to her Complaint, docket no. 1, ex. A, appear to document the portion of her dance fees that Doe paid to Cin-Lan for two nights during April of 2008. These demonstrate that on those nights she remitted a total of $526 to Cin-Lan over the course of a total of twelve and one-half hours on the clock. Thus, for these two nights at least, Cin-Lan's 35% share of Doe's dance fees amounted to just over $42 per hour. Doe's corresponding 65% share would have been nearly double that – between $75 and $80 per hour.[2] While Doe claims she has never signed any contract with

---

[2] This number is not necessarily representative of Doe's earnings over the entire time she worked at the club. Instead, the Court regards it as an illustration of the financial incentives employees had to elect independent-contractor treatment rather than employee treatment. As a result, it also does not attempt to account for any tips a dancer would

Cin-Lan, Doe aff., docket no. 35, at ¶ 11, and Cin-Lan has been unable to produce any such document with her signature, it appears that the terms of their relationship have been in many ways similar to the standardized contract's "independent contractor" terms. Cin-Lan has adduced affidavits from three other dancers at its club containing affirmations that they signed such a contract. Holloway aff., docket 14, ex. D, at ¶ 3; Moyer aff., docket 14, ex. E, at ¶ 3; Russman aff., docket 14, ex. F, at ¶ 3;[3] Moyer aff., docket 36, at ¶ 2; Holloway affidavit, docket 36, at ¶¶ 2-3.

Doe's claim in this lawsuit is that, contrary to the appellation in the standardized contract, the term of her relationship with Cin-Lan made her its "employee" for purposes of the Fair Labor Standards Act, codified at 29 U.S.C. § 2001 *et seq.* (hereinafter "the FLSA"), and thus that she is entitled to receive from Cin-Lan the various benefits mandated by the FLSA. These benefits include a minimum wage and the right, subject to limited exceptions not relevant here, to retain all tips received on the job. Although it is not relevant to the instant motion, Doe further maintains that the dance fees are "tips" within the meaning of the FLSA, and thus that it is unlawful for Cin-Lan require her to remit a portion of those funds to it in the form of "rent."

---

receive after her performances, since both independent contractors and employees would be permitted to keep those.

[3] Each of these affidavits contain identical language. They will hereinafter be referred and cited to collectively as the "Holloway/Moyer/Russman affidavits." Samatha Holloway and Kimberly Moyer each attested to second affidavits, *see* docket no. 36, which will be referred to separately as "Holloway affidavit" and "Moyer affidavit." Defendants also filed an unsworn statement purportedly signed by 23 other dancers at the club, most of whom used pseudonyms or their first names only. Docket no. 14, ex. N. Because this filing simply duplicates other evidence submitted by the parties, the Court will not opine on its evidentiary value.

B.  The Instant Motion

Cin-Lan was served with the complaint and summons in this putative class action on June 27, 2008.  Doe states that when she came to the club to perform on July 2nd, the general manager of the club met her at the door and explained that the club would treat her lawsuit as a request to be as an "employee," under the terms described above, rather than as an "independent contractor," and thus that she would be required to complete a "new hire packet" including forms regarding tax withholding and employment eligibility verification, and the non-competition agreement.  Among other things, he said that being an employee meant Doe could be required to "mop the floor."   The manager further suggested that this switch from independent-contractor to employee status "could be reversed," apparently if Doe was willing to withdraw her "request" -- i.e., the lawsuit.

Doe declined to sign any of these forms, with the result that she has not been permitted to dance at the club since that date.  Instead, she has been performing at a different club in Traverse City, Michigan, which requires her to maintain a separate apartment there.  She further claims that in response to the lawsuit, Cin-Lan has "blacklisted" her with other nightclubs in the Lansing area, with the result that she is unable to find work closer to her home.

II.  Procedural Posture

In response to this treatment, Doe filed the instant emergency motion for a temporary restraining order or preliminary injunction, claiming that Cin-Lan's actions were the type of "retaliation" forbidden by the FLSA.  She asks that the Court order Cin-Lan to pay her a minimum wage of $5.15 per hour, permit her to retain all her dance fees as tips, (or at least the standard "independent contractor" rate of 60 to 70 percent of those fees) and report all

her wages and tips to the IRS. She further asks that Cin-Lan be prohibited from requiring her to mop the floor or perform any other janitorial tasks, and announce to other nude dancers at the club that no retaliatory action will be taken against them for participating in this lawsuit. Alternatively, she requests an order that defendants pay her $1000 per day until she is once again permitted to perform at the club under the same terms as the "independent contractor" dancers.

This motion was referred to Magistrate Judge Hluchaniuk, and quickly generated a flurry of filings from each side, most of which resulted from the parties' attempts to add or change evidence, legal theories, and requested relief.[4] After the hearing before Judge Hluchaniuk, Doe filed two supplemental briefs and Cin-Lan responded with one of its own. Judge Hluchaniuk's recommendation was that the Court grant essentially all the relief requested by Doe, modified only to permit Cin-Lan to retain 35% of her dance fees. He specifically recommended that this Court order the 35% to be regarded as a "service charge" imposed by Cin-Lan on the paying customer, whereas the remaining 65% "be considered 'tip income' to plaintiff." R&R at p. 37.

The defendants objected to the recommendation on several grounds, which can be summarized as follows:

---

[4] The two sides each submitted affidavits, and the plaintiff verified her complaint, after the hearing before Magistrate Judge Hluchaniuk; in fact, both sides submitted affidavits after the R&R was issued. This Court is exercising its discretion under 28 U.S.C. § 636(b) to consider the additional evidence in reviewing the R&R. In order to ensure that each side had a fair opportunity to respond to the other's evidence, the Court invited the parties to file additional affidavits – which they did, *see* docket nos. 35 & 36 -- and held a lengthy additional hearing.

(1) The court has no jurisdiction to entertain a private litigant's motion for an injunction compelling the payment of a FLSA minimum wage.

(2)  If Doe really is an "employee" for purposes of tax law, then treating 65% of her dance fees as "tips" would require it to violate IRS regulations mandating that employers pay taxes on funds of this type received by employees.

(3)  Giving Doe what she is asking for -- employee classification -- cannot be regarded as "retaliation" even if Cin-Lan also reconfigures her compensation package.

(4) Because Doe had no set work schedule before this litigation, the R&R's recommendation that Cin-Lan be required to permit her to work the same schedule is injuriously vague.

(5)  The harm Doe claims to have suffered is only money damages, and that as a result she has suffered no irreparable harm so as to justify a preliminary injunction.

(6)  Because Doe is in fact not an "employee" under the FLSA, she has no likelihood of succeeding on the merits of her retaliation claim.

(7)  Doe should be equitably estopped from running up her damages claim by requesting an injunction forbidding Cin-Lan from treating her fully as an employee.

Because the defendants are entitled to *de novo* review on each of these objections, *see* 28 U.S.C. § 636(b)(1), the Court will revisit each of the four preliminary injunction factors in their traditional order, and consider each objection under the factor to which it is most pertinent.

ANALYSIS

I.  Jurisdiction

The defendants object that the federal courts have no jurisdiction to entertain requests for injunctive relief by individuals claiming FLSA violations.  Magistrate Judge Hluchaniuk correctly reported that the FLSA, at 29 U.S.C. § 216(b), permits a court to order "employment, reinstatement, promotion, and the payment of wages lost" as well as money damages.  R&R at p. 10.  By its own terms, however, § 216 permits enforcement only of 29 U.S.C. § 215(a)(3), which forbids only "discriminat[ing] against any employee because such employee has . . . instituted any proceeding under or related to this chapter."  Magistrate Judge Hluchaniuk recognized that because § 216(b) provides this private right, a violation of this subsection is "unlike other violations of FLSA," for which no private injunctive relief is available.  R&R at p. 11.

The defendants do not object to this construction of the law, but rather claim that under this legal rule a portion of the relief recommended by Judge Hluchaniuk is unwarranted, because it would go beyond remedying retaliation to address the merits of Doe's FLSA claim itself.  Specifically, they object to Judge Hluchaniuk's recommendation that Cin-Lan be ordered to pay Doe the minimum wage required by the FLSA, despite the fact that she did not receive one before instituting this lawsuit.  The defendants add that even if there were no jurisdictional problem, general equitable principles permit preliminary injunctions only to maintain the status quo.

Doe's only response is that paying her a minimum wage was part of Cin-Lan's alleged retaliation, and so ordering it to continue doing so cannot be improper.  There is no apparent reason to conclude that this is so.  Magistrate Judge Hluchaniuk noted, to no

8

objection by either side, that the FLSA only creates jurisdiction for a court to order an employer to return an employee to her pre-retaliation status.  Even if some portion of an alleged retaliation actually benefits the employee, the Court finds that this standard does not create jurisdiction for a court to order an employer to continue providing that benefit.[5]

A straightforward conclusion therefore follows:  If the Court concludes that Cin-Lan's abandonment of its policy in response to this lawsuit was retaliatory discrimination, and if Doe prevails on the other elements of her retaliation claim, then the Court will have jurisdiction to enjoin Cin-Lan to reinstate its previous  method of splitting dance fees with her.  On the other hand, integral to Doe's FLSA claim is the fact that Cin-Lan never paid her a minimum wage before this lawsuit was instituted, and she has not alleged that it had shown any inclination to do so.  Indeed, Cin-Lan offered Doe the minimum wage only in response to the filing of this lawsuit.  Therefore, Doe cannot have been denied a minimum wage in retaliation for filing it.   While Cin-Lan is free to pay the plaintiff a minimum wage if Cin-Lan wishes – and will be liable in damages for any failure to do so if Doe is ultimately adjudicated to be an FLSA employee – the Court has no jurisdiction to enter an injunction to that effect.

---

[5] Nor does the standard create jurisdiction to order the defendant to *cease* providing the benefit.  Rather, the Magistrate's interpretation of § 216(b) leaves all but the retaliatory terms of a business relationship, including benefits imposed in conjunction with retaliation, exactly where it found them – subject to negotiation based on the relative preferences and bargaining power of the parties.

II.  Preliminary Injunction Motion

    A.  In General

The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court. *Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996), *cert. denied*, 519 U.S. 807 (1996). The Supreme Court and the Sixth Circuit have noted that "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). *See also Ramik v. Darling Intern., Inc.* 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001) (Gadola, J.) ("The purpose of a preliminary injunction is to preserve the status quo for trial."). The Sixth Circuit, however, has advised that "a preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted).

When considering whether to grant the "extraordinary" remedy of a preliminary injunction, a district court must consider and balance four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the preliminary injunction; (3) whether issuance of the preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the preliminary injunction. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citations omitted).  These four elements "are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (citation omitted).  A district court must make specific findings

concerning each of the four factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995); *Jones*, 341 F.3d at 476 (citations omitted).

B.  Likelihood of Success on the Merits

The defendants do not object to Magistrate Judge Hluchaniuk's articulation of the two elements of a successful FLSA retaliation claim: a showing that "(1) defendants took actions constituting discrimination after [the plaintiff] filed her lawsuit; and (2) she is an employee."  R&R at 14.  They do, however, take issue with the Magistrate's findings that Doe is likely to succeed in establishing each of these elements.

1.  Doe's Likelihood of Proving That She Is An FLSA "Employee"

The defendants object that Doe is not an "employee" within the meaning of the FLSA, and thus is not entitled to its anti-retaliation protections.  There was initially a dispute between the parties as to whether § 216(b) protects from retaliation only persons who actually are FLSA employees – that is, who are actually entitled to the relief that they are retaliated against for seeking.  At and after the hearing before Judge Hluchaniuk, however, Doe conceded that only true FLSA "employees" are entitled to anti-retaliation relief.  In any event, Magistrate Judge Hluchaniuk came to the same conclusion, R&R at p. 14, and Doe filed no objection.  The Magistrate Judge's conclusion comports with the language of § 216(b), which forbids only "discriminat[ing] against any *employee*" (emphasis added).

Thus, the defendants mount a three-pronged attack on Judge Hluchaniuk's conclusion that Doe is in fact likely to succeed in showing that she is an employee.  First, they claim that the report incorrectly applies a truncated version of the applicable legal standard.  Second, they object that the R&R improperly accepted as true the unverified

allegations of the complaint. Third, they argue that Judge Hluchaniuk erroneously failed to consider a number of decisions finding nude dancers to be "independent contractors." The Court has addressed defendants' second objection by receiving the additional affidavits and the verification of the complaint as evidence, and by inviting further affidavits and holding a hearing to permit the parties to address these additional portions of the record. This new evidence now requires the Court to re-assess Doe's likelihood of success in proving that she is in fact an FLSA employee. Before doing so, however, the Court will deal with the defendants' other objections.

a. The Legal Standard

The Sixth Circuit has made clear that

> In interpreting [the FLSA] the courts have construed the Act's definitions liberally to effectuate the broad policies and intentions of Congress . . . The terms 'independent contractor', 'employee', and 'employer' are not to be construed in their common law senses when used in federal social welfare legislation . . . Rather, their meaning is to be determined in light of the purposes of the legislation in which they were used. [I]n the application of such legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service.

*Donovan v. Brandel*, 736 F. 2d 1114, 1116 (6th Cir. 1984) (alterations in original) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F. 2d 139, 143-45 (6th Cir. 1977)). As a result, a multi-factored "economic realities test" has developed in many circuits for use in determining whether an employment relationship exists under the FLSA. Magistrate Judge Hluchaniuk applied the Sixth Circuit's version of the test in this case. R&R at pp. 17-25. The test evaluates six factors to determine whether, in economic reality, a worker is employed by the business where he or she works. These factors are (1) the permanency of the relationship, (2) the degree of skill required from the worker, (3) the extent of the worker's

12

investment in equipment or materials, (4) the worker's opportunity for profit or loss, depending on his or her skill, (5) the extent of the alleged employer's right to control the manner in which the work is performed, and (6) whether the services rendered by the worker are an integral part of the business. *Donovan v. Brandel*, 736 F. 2d 1114, 1117-19 (6th Cir. 1984) (cited in *Imars v. Contractors Mfg. Servs., Inc.*, No. 97-3543, at *2, 1998 WL 598778 (6th Cir. 1998).

The defendants here, however, object that the Magistrate Judge failed to consider what they characterize as the "antecedent question of employment" – their contention that if a business does not pay a worker, the economic realities test does not even apply, and the worker cannot be an "employee." This doctrine appears to be in place in at least the Eighth Circuit. *See Graves v. Woman's Professional Rodeo Ass'n*, 907 F. 2d 71, 72-74 (8th Cir. 1990)*,* and has been applied by the Second Circuit to the similar question of whether a common-law employment relation exists. *O'Connor v. Davis*, 126 F. 3d 112 (2d Cir. 1997).

Defendants' cases in support of this doctrine, however, suffer from several shortcomings. First, none are controlling precedent for this Court. Second, none of them specifically addresses a situation analogous to this one: in *O'Connor*, the defendants' leading case, the Second Circuit was applying common-law agency doctrine. *O'Connor*, 126 F. 3d at 115. The court in *Neff v. Civil Air Patrol*, 916 F. Supp. 710, 711-15 (S.D. Ohio 1996), the only case defendants cite from a court in this Circuit, simply applied the economic realities test in summary fashion by noting only that "unpaid volunteers," 916 F. Supp. at 712, typically do not satisfy the test for purposes of Title VII. In *Graves*, the Eighth Circuit was dealing with a professional organization that did not require a worker to become

13

a member of it to compete for the prize money offered by third parties in events sanctioned by the organization. This case, by contrast to each of those, involves an application of the economic realities test under the FLSA to dancers who are required to enter a business relationship with Cin-Lan to receive third-party payments from Cin-Lan's customers.

Third, other than *O'Connor* and *Graves*, none of the cases truly establishes the clear "antecedent question of employment" that defendants purport to extract from them. As noted, *Neff* is an application of the economic realities test to the context of unpaid volunteers. Similarly, in *Patel v. Wargo*, 803 F. 2d 632, 635 (11th Cir. 1986), the Eleventh Circuit noted there was no evidence that the plaintiff "contemplated compensation for his acts" *or* that "as a matter of economic reality [plaintiff] was dependent upon [defendant]" – strongly suggesting that the first inquiry is part and parcel of, and not an ironclad antecedent to, the second. And in *Villarreal v. Woodham*, 113 F. 3d 202, 205 (11th Cir. 1997), the court was speaking only "in general" when it stated that "work constitutes employment when there is an expectation of in-kind benefits in exchange for services."

Finally, and most importantly since none of the foregoing authorities are binding here, there is no persuasive reason to adopt the antecedent compensation test advocated by the defendants. A worker's compensation structure is no doubt relevant to the question of employment. But in this case at least, the Court finds no justification for superimposing the rigid, formalistic requirement advocated by defendants upon what the Sixth Circuit has described as an inquiry that "does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity." *Donovan*, 736 F. 2d at 1116. When, as here, a worker's receipts are actually shared between the worker and her alleged employer, the distinction between wages and third-party payments

14

is blurred; resolving the entire question of employment on the categorization as one or the other is more likely to distort than to facilitate the decisionmaking process. Therefore, the Court concludes that application of an antecedent compensation test in inappropriate in the present case.

### b.  Treatment of Related Precedent

The defendants object that by concluding Doe is likely to succeed in showing that she is an FLSA employee, Magistrate Judge Hluchaniuk erroneously failed to consider a wide body of precedent finding that nude dancers are independent contractors for purposes of various state and federal tax and labor regimes. As examples of these precedents, they cite more than a dozen different rulings or decisions. Most are from state agencies, a handful are from state and federal courts, and a few come from the IRS. *See, e.g,* defendants' response brief, docket no. 14, exs. G-M; defendants' supplemental brief, docket no. 18, exs. C-J.

It is true that Judge Hluchaniuk did not follow these decisions, or even refer to them, in recommending that this Court find Doe to be an employee and not an independent contractor for purposes of the FLSA. What is unclear is exactly how and why the defendants believe that "correcting" his omission of consideration of these cases should yield a different outcome. None of these decisions are controlling precedent on this Court; most are unpublished decisions of administrative agencies from states outside this Circuit. Many of them include only brief explanations of the governing law of the jurisdiction or of the facts to which it is being applied.[6] *See, e.g., In re Allied News Corp.*, No. 90-0155 ITC

---

[6]  Defendants assert that some of these cases dealt with dancers performing under contracts similar or identical to the one used by Doe's club -- although not all the decisions

15

(Ind. Dept. of Rev. Letter of Findings (undated) (single paragraph explanation of facts involved).

Most decisively, however, the cases cited by the defendants are unpersuasive because almost none of them involved an application of the FLSA to the situation of nude dancers. The defendants argue at length that, in the Sixth Circuit, the common-law test for employment is nearly the same as the economic realities test. In support of this argument, they cite *Shah v. Deaconess Hospital*, 355 F. 3d 496,499 (6th Cir. 2004), in which the Sixth Circuit compared its version of the common-law test with the economic realities test, and found the difference between the two to be "minimal." Likewise, in *Simpson v. Ernst & Young*, 100 F. 3d 436, 442 (5th Cir. 1996), the Sixth Circuit noted that there was "no material difference" between the tests.[7] The *Shah* court recited the Sixth Circuit's common law test as requiring

> the consideration of numerous factors, including the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

*Shah*, 355 F. 3d 496, 499-500. In response, the plaintiff cites older Sixth Circuit precedent to the contrary. *E.g., Dole v. Elliott Travel & Tours, Inc.*, 942 F. 2d 962, 965 (6th Cir. 1991).

---

indicate as much. To the extent this assertion is accurate, it obviously increases the likelihood of a significant degree of factual similarity between those cases and this one. But the problem of potentially different legal standards remains.

[7] Neither of these cases dealt with the FLSA, but both involved the ADEA. The Sixth Circuit has imported the FLSA economic realities test into the ADEA context. *See Lilley v. BTM Corp.*, 958 F. 2d 746, 750 (6th Cir. 1992).

The Court notes that before *Simpson* or *Shah* were decided, the Supreme Court explicitly held that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 325-26 (1992). Thus, one explanation of *Simpson* and *Shah,* which would be consistent with defendants' assertions here, is that the Sixth Circuit has expanded its common-law test somewhat in order to correspond to the broader FLSA standard.

Even if, as defendants contend, the common-law and economic realities tests are indeed identical in the Sixth Circuit, that would mean only that *this Circuit's* version of the FLSA test is identical to the common-law employment test used by the Circuit, or some state or states therein. This would expand the universe of relevant precedent to, at most, cases arising within the Sixth Circuit.[8] By contrast, the elements of the tests being applied

_____

[8]   *Taylor Boulevard Theatre, Inc. v. United States*, No. Civ.A 3:97-cv-63-H, 1998 WL 375291 (W.D. Ky. May 13, 1998), is a case from a court in this circuit, but in other respects its relevance to this case is even more tangential than the other decisions cited by the defendants. In *Taylor*, the Court concluded that a Deja Vu club's tax treatment of its dancers as employees was permitted, not because they actually were employees, but because the club had consistently treated them as such and it was standard industry practice to do so. *Id.* at *4 ("Plaintiff's burden is not to show that the dancers ought to be considered nonemployees for tax purposes, but rather than it had reasonable grounds to do so"). The court's only conclusion as to actual employee status was in dicta, and was merely that "it is not obvious that Plaintiff's dancers should be classified as 'employees' under a common law test." *Id.* A non-controlling case containing dicta that defendants' position is "not obvious[ly]" wrong, is -- at best -- marginally persuasive here.

Cases from other jurisdictions might also be somewhat persuasive to the extent they are interpreting the same legal source material, such as the FLSA or the common-law employment test of a state in this circuit. Thus, *Thompson v. Lounge Management, Ltd.*, No. CX-03-1258 (1st Dist. Minn. May 6th, 2004), has some limited value. In that case, a Minnesota trial court was asked to determine a nude dancer's status under the FLSA. The court acknowledged "a divergence of opinions and tests offered by many federal and state courts" and listed three of them, *id.* at *5-8, but professed to adopt a test with factors at least nominally identical to the Sixth Circuit's. *Id.* at *8. *Thompson's* value is lessened,

in many of the adjudications cited by the defendants differ from each other, and from the elements of the Sixth Circuit's FLSA test. For example, in *In re A Touch of Class*, No. C-T-62699-0001, at *2-3 (Cal. Unemp. Ins. App. Bd. June 5, 1995), the California Unemployment Insurance Appeals Board deployed two different tests. One test featured eight factors, including "whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision" and "whether or not the parties believe they are creating the relationship of employer-employee." *Id.* at *2. The other test involved ten factors, among which was "whether there is a right to discharge at will." *Id.* at *3. *Cf.* Confidential Record, No. 01-19559, at *4 (Ind. Dept. Of Workforce Development Unemp. Ins. App. Aug. 24, 2001) (applying a three-part employment test, which according to state law superseded the common-law test, and which included an examination of whether the worker was "customarily engaged in an independently established trade"). None of these factors are separately enumerated in either the Sixth Circuit's *Donovan* economic realities test or its *Shah* common-law test. In addition, while some of the factors recited in these decisions are nominally similar to the Sixth Circuit's factors, defendants offer no authority for the proposition that the Sixth Circuirt regards the *substance* of these factors as being identical to that of its own, or that it would weigh the various factors in the same manner as was done in the decisions cited by the defendants.

Counsel for the defendants have implicitly acknowledged that different states use different *de facto* versions of the employment test. At the hearing held before the Court on

though, by the fact that the court actually considered a number of other factors, including the language of the parties' agreement and whether employment records were kept. *Id.* at *10-11.

this motion, the defendants characterized California as the "most liberal state" in finding that employment relationships exist, thus acknowledging that the substance of the legal test for employment varies from state to state -- and also, presumably, between the many decisions and adjudications they press on the Court.[9]

In sum, then, the defendants' objection amounts to a complaint that the outcome recommended by Judge Hluchaniuk is inconsistent with a number of non-controlling cases and agency adjudications, some of which involved facts that are not demonstrably similar in any degree to this case's, and almost all of which applied law that is likely dissimilar in some unknown degree to the Sixth Circuit's economic realities test, which indisputably controls here. In the absence of any showing by the defendants that the legal tests being applied in the adjudications they cite are identical to either the Sixth Circuit's economic realities test or its common-law test -- or even that any of the *factors* being applied are similar to the Sixth Circuit's factors in more than name only -- the persuasiveness of these cases is quite low.

It should also be noted that the plaintiffs cite significant and persuasive authority from federal courts, specifically finding that nude dancers *are* FLSA employees. In *Reich v. Circle C Investments, Inc.*, 998 F. 2d 234 (5th Cir. 1993), the Fifth Circuit dealt with almost the precise legal issues involved here – an adjudication of the FLSA status of nude dancers whose agreement with the defendants purported to make them "mere tenants who rent stages, lights, dressing rooms, and music." *Id.* at 329. That court applied a five factor test,

---

[9] The Court expresses no view on the accuracy of this characterization of California law. Suffice it to say that however liberal it may or may not be, it is not being applied here, and thus decisions under it are of limited value at best.

which was at least nominally identical to the Sixth Circuit's test but for the fact that it omitted an inquiry into whether the work was integral to the business. *Id.* at 327-29. The Fifth Circuit concluded that

> [d]espite the lack of permanency, on . . . balance, the five factors favor a determination of employee status. A dancer has no specialized skills and her only real investment is in her costumes. Circle C exercises significant control over a dancer's behavior and opportunity for "profit." The transient nature of the work force is not enough here to remove the dancers from the protections of the FLSA. In analyzing the five factors, we must not lose sight of economic reality. Here, the economic reality is that the dancers are not in business for themselves but are dependent upon finding employment in the business of others.

*Id.* at 329.

The district court in *Reich v. Priba Corp.*, 890 F. Supp. 586, 592-94 (N.D. Tex. 1995) reached a similar conclusion. In *Harrell v. Diamond A Ent., Inc.*, 992 F. Supp. 1343 (M.D. Fla. 1997), the court applied a test that was nominally identical to the Sixth Circuit's, *id.* at 1348-52, and concluded that "[t]he totality of the evidence before the Court indicates that Diamond A employed Plaintiff as defined under the FLSA." *Id.* at 1354.[10]

These cases do not dictate a specific conclusion on the Court. They are from other Circuits, apply what appear to be a slightly different legal tests, and involve facts slightly different from the ones here. Notably, the degree of control exercised by defendants that is established by Doe's evidence here is somewhat less than was the case in *Circle C*, 998

---

[10] Defendants correctly note that the *Harrell* court was merely denying the defendants' summary judgment motion, and as such subjected the plaintiff to a much lower likelihood-of-success standard than that which would apply here. The Court will discount it accordingly, but declines to omit it from consideration altogether as the defendants suggest. The *Harrell* court's dicta goes considerably beyond the summary-judgment standard. Additionally, even a bare denial of summary judgment would have some lower level of persuasiveness.

F. 2d 324, 327, or in *Harrell*, 992 F. Supp. 1343, 1348-49. The plaintiff's cases do, however, overcome the defendants' argument that respect for the decisions of other adjudicative bodies, even when their decisions are not mandatory precedent for this court, requires this Court to find Doe unlikely to be able to prove that she is an FLSA "employee." Instead, the relevant precedents on this question are mixed, and appear to depend on the facts of each case. Therefore, Court will proceed by engaging in its own application of controlling Sixth Circuit law to the established facts of the case.

c. Application of the Economic Realities Test

After receiving the new evidence submitted since the issuance of the R&R, the Court will examine each factor of the test set forth by *Donovan* in light of the augmented record.

i. Permanency of the relationship

Magistrate Judge Hluchaniuk noted that, when considering the status of pickle pickers whose terms of work were "potentially renegotiated every year," the Sixth Circuit found the "temporary" nature of the engagement to tell against the existence of an employment relation. R&R at pp. 18-19 (citing *Donovan v. Brandel,* 736 F. 2d 1114, 1117 (6th Cir. 1984). In this case, however, he found "no evidence to suggest that the terms under which plaintiff performs services at defendants' establish[ment] is subject to any renewal or

renegotiation procedure," R&R at 19,[11] and thus concluded that the permanence factor weighs in favor of the plaintiff.

Cin-Lan asserts that many dancers at its club "perform only on a single day or a given weekend, or a week or two." Simes aff., docket no. 36, at ¶ 19. Doe, however, claims that she has worked at the defendants' club since June 2007. Compl. at ¶ 53; Doe aff., docket no. 35, at ¶ 4. One of defendants' supervisory employees "believe[s] that the Plaintiff commenced performing at Cin-Lan in early July of 2007." Sime aff., docket no. 18, ex. A, at ¶ 15. According to Cin-Lan's records, for two months starting near the end of September 2007, Doe danced there most Fridays and Saturdays. Simes aff., docket no. 21, exs. A-1 & A-2. Starting at the beginning of December 2007, Cin-Lan's records and Doe's affidavits agree that she danced between three and seven days each week (with the exception of one week off in May 2008) until the alleged retaliation occurred on July 2nd. *Id;* Doe aff., docket no. 26, ex. A, at ¶ 42; Doe aff., docket no. 35, at ¶¶ 4, 16.

Doe further claims that she was "restricted from working at other exotic dance nightclubs while in a working arrangement with Defendants." Compl. at ¶ 37; Doe aff., docket no. 26, ex. A, at ¶ 20; *see also* Doe aff., docket no. 33, at ¶ 17 ("Defendants tried

---

[11] One of the two standardized contracts submitted by Cin-Lan state that they expire at the end of the current calendar year or can be terminated without cause on 30 days' notice. Dancer Performance Lease, docket no. 14, ex. C, at ¶¶ 1, 18. The other provides that the contract will run for one year from the date of signing unless terminated in a similar fashion. Dancer Performance Lease, docket no. 36, at ¶¶ 1, 18. But the defendants have produced no evidence to show that either contract actually governs its relationship with Doe. *See* Simes aff., docket no. 14, ex. B, at ¶ 8 ("I do not have a specific recollection of meeting with Jane Doe to review the Application and Lease [or] whether or whether or not Jane Doe signed the Application and/or Lease at the club or took those document with her for further review."); *id.* at ¶ 10 ("I cannot locate a signed copy of Jane Doe's Application or Lease.")

to preclude and dissuade dancers from working at other adult nightclubs"). The defendants vigorously dispute this allegation. Docket 14, ex. A, at p. 4 ("[a]s an Independent Contractor, you can work for as many clubs as you choose"); Dancer Performance Leases, docket no. 14 ex. C, and docket no. 36, at ¶ 4 ("Entertainer is free to perform her entertainment activities at other businesses or at locations other than at the Club's Premises"); Holloway/Moyer/Russman affs., docket no. 14, exs. D, E, & F, at ¶¶ 7-8; Sime aff., docket no. 18, ex. A, at ¶ 14; Sime aff., docket no 36, at ¶ 8; Moyer aff., docket no. 36, at ¶ 7; Holloway aff., docket 36, at ¶ 7.

In light of all this, the Court concludes that Doe is likely to be able to show that through the end of June 2008, she had worked several nights per week, several hours per night, at defendants' club since sometime in late of 2007 – that is, somewhere between six and twelve months before the alleged retaliation occurred. Absent any more specific allegations as to how the defendants precluded or discouraged her from working for other clubs, and in the face of such repeated and emphatic denials, though, Doe has not established a likelihood of being able to show that her relationship with Cin-Lan was in any way exclusive.

Were the arrangement in fact (more than six months of regular, if non-exclusive, work) typical of Cin-Lan workers, the factor would weigh strongly in favor of finding an employment relationship. Since Doe has not adduced any evidence that her situation is common, and indeed since the defendants' evidence as to the transient status of many dancers suggests that she may have a relatively unusual level of seniority at their club, the Court is reluctant to conclude that someone can become an FLSA "employee" by mrely staying on a job longer than is usual for workers of a given type. As a result, the Court

concludes that Doe has made only a relatively weak showing that the permanence of her work would render her to be an FLSA employee.

<u>ii. Degree of skill required of Doe</u>

Magistrate Judge Hluchaniuk relied on *Reich v. Circle C Investments, Inc.,* 998 F. 2d at 328, in agreeing with the plaintiff that no significant degree of skill is required of a nude dancer. Doe asserts that she has "no formal training in dance," Doe aff., docket no. 35, at ¶ 18, was neither offered nor required to obtain any training or instruction of any kind as to how to perform her dances at the club,[12] and that the dance skills she used at the club "were commensurate with those exercised by ordinary people who choose to dance at a disco or a wedding." *Id.* at ¶ 19; Compl. at ¶ 45; Doe aff., docket no. 26, ex. A, at ¶ 29. In their affidavits, the other dancers at the club have taken serious issue with that characterization. Moyer aff., docket no. 36, at ¶ 9; Holloway aff., docket no. 36, at ¶ 10.

Indeed, Doe claims that she utilized no business skills whatsoever, and that the scope of her initiative in her work "is restricted to decisions involving what clothes to wear (within Defendants' guidelines) or how provocatively to dance." Compl. at ¶ 46; Doe aff., docket no. 26, ex. A, at ¶ 30; *see also* Doe aff., docket no 35, at ¶ 21. In particular, she says she was not permitted to sell any tangible products while working. Doe aff., docket no. 35, at ¶ 23.

The defendants, however, point out that their dancers are free to "develop a fan base of regular customers," who will pay for their dances either at Cin-Lan's clubs or at other venues, by independently advertising their dancing abilities to the public.

---

[12] Cin-Lan asserts the absence of any club-provided training is instead evidence that Doe is genuinely independent of the club. Sime aff., docket no. 36, at ¶ 13.

Holloway/Moyer/Russman affs., docket no. 14, exs. D, E, & F, at ¶ 8-9; Sime aff., docket no. 18, ex. A, at ¶ 14 ("[t]he entertainer is free to inform those customers of the dates, time, and locations of her performance at other gentlemen's clubs in order to entice them to follower her to that other club"), and claim that at least some dancers actually do so by means of "photographs, print advertising, internet advertising, and performing 'stage sets.'" Sime aff., docket no. 36, at ¶ 6; *see also id.* at ¶ 14. According to Cin-Lan, dancers may even hire hairstylists and makeup artists to assist them in the club's dressing room. *Id.* at ¶ 15. As a result, Cin-Lan claims, "[m]any entertainers have 'regular' customers who follow the entertainer to the club where she may be performing at that particular time," and "[t]he club receives many telephone calls inquiring as to whether a particular entertainer is performing that day or evening." *Id.* The defendants seem to suggest these facts dictate that successful nude dancing requires a significant modicum of business acumen.

The Court concludes that Doe is likely to succeed in showing that her work required no special skills. It is not impossible that in some times and places, maintaining a nude dancing career could require significant artistic skill or business savvy. But such an abstract possibility cannot substitute for the record before the Court in this case. On the record, the plaintiff's claims of the low level of skill involved in her work are thoroughly plausible. The novelty of public nudity corroborates her assertion that most of a nude dancer's business is attracted by her "physical attributes," Compl. at ¶ 54; Doe aff., docket no. 26, ex. A, at ¶ 39; Doe aff., docket no. 36, at ¶ 60, rather than by her artistic skill. The statements submitted in contradiction by the defendants fail to meaningfully explain how sexually suggestive dancing requires any particular degree of skill. As a result, it appears that the skills in both dancing and self-promotion that are required of nude dancers like Doe

are moderate. The use of such skill is insufficient to suggest that a worker is an independent contractor rather than an employee.

### iii. Doe's investment in materials and equipment

Magistrate Judge Hluchaniuk concluded that, because Cin-Lan's investment in the physical plant and inventory of the club dwarfed Doe's investment in her rent and costumes, this factor tends to make her an employee. Again, this conclusion was supported by the Fifth Circuit's holding in *Reich v. Circle C Investments, Inc.*, that nude dancers' investments are "relatively minor" compared to those of their clubs. In response, defendants point out that nude dancers have other significant items of expenses.

Doe claims, and the defendants apparently do not dispute, that she has made "no capital investment in the facilities, advertising, maintenance, sound system and lights, food, beverage and other inventory, or staffing" of the club. Compl. at ¶ 49; Doe aff., docket no. 26, ex. A, at ¶ 33; *see also* Doe aff., docket no. 35, at ¶¶ 29-33. She paid, however, a "base rent" of $5.00 per shift, in addition to turning over to Cin-Lan 35% of her dance fees. *Id.* at ¶ 28. Cin-Lan asserts that there are significant additional costs involved with being a dancer, and that some dancers spend "literally thousands of dollars on hairstyling, nails, make-up, body tanning, cosmetic surgery, costumes, props, and the like." Sime aff., docket no. 36, at ¶ 16; *see also* Moyer aff., docket 36, at ¶ 11; Holloway aff., docket no. 36, at ¶ 12. Doe claims, however, that her personal outlays for clothing and to improve her appearance were no greater than would be expected of an employee at most jobs. Doe aff., docket no. 35, at ¶ 26.

The Court concludes that Doe is likely to be able to show that her investment is small enough to indicate that she is an employee rather than an independent contractor.

26

Although it may not be entirely *de minimis*, due in part to some of the expenses pointed out by defendants, the fact remains that any single nude dancer is likely to pay only a small portion of the overall costs required for her work. The dancers' remittal of 35% of their dance fees to the club might in some instances cover a fair portion of the overhead costs attributable to them, but this "rent" is measured as a portion of the dancer's receipts, and not as a fixed fee. Thus, under the business relationship chosen by Cin-Lan and its dancers, if a dancer fails to solicit enough paying customers, or if business is poor for some other reason, it is the club and not the dancers that ultimately will be required to pay the capital and overhead costs required for the provision of nude dancing. Under those terms, a dancer who is unable to attract enough customers to cover these costs will still be entitled to keep 65% of the dance fees she generates, and thus she will essentially receive large investments in capital and overhead for free from the club. The club likewise will continue to provide these items, free of charge and without objecting or imposing any negative consequences, for as long as the dancer cares to continue her efforts. Thus, even though it is a large dollar amount for some dancers, the club's portion of the dance fees cannot be regarded as true investment on the part of the dancers. What remains is a dancer's personal expenses connected with her job, which in Doe's case appear to be only a tiny portion of the enterprise costs involved in providing nude dancing.

As a result, this Court agrees with Judge Hluchaniuk and the Fifth Circuit, and concludes that whatever the precise size of Doe's financial investment in her work may have been, it was minor enough in comparison with the overall costs of her business to suggest that she was an FLSA employee, and not an independent contractor.

### iv.  Doe's opportunity for profit and loss

The parties seem to agree that Doe's potential losses are limited to her investment in the business, but as noted above they sharply disagree over the extent of that investment.  *Compare* Doe aff., docket no. 35, at ¶ 37, *with* Sime aff., docket no. 36, at ¶¶ 18, 32.  Magistrate Judge Hluchaniuk concluded that Cin-Lan controls all the major determinants of Doe's profits, and thus that this factor weighs in favor of employee status. R&R at pp. 21-23.

Doe alleges in her verified complaint that Cin-Lan "controls all of the advertising and promotion" for the club, and "create[s] and control[s] the atmosphere and surroundings" there, Compl. at ¶ 36; Doe aff., docket no. 26, ex. A, at ¶ 19; *see also id.* at ¶ 34,  without which neither the club nor its dancers would attract any customers. This claim is substantially corroborated by the evidence in the record.  *See* docket no. 14, ex. A, at p. 4 (defendants' standardized paperwork representing that "[a]s an Independent Contractor, you will never be required to engage in any club promotions or advertising"); Dancer Performance Leases, docket no. 14, ex. C and docket no. 36, both at ¶ 2 (club will "provide . . . music . . . lighting, and dressing room facilities; pay any and all copyright fees . . . and [a]dvertise the business in a commercially reasonable manner").  Cin-Lan, Doe says, also "manage[s] all aspects of the business operation" and controls all staff members, Compl. at ¶ 50, as well as determining the amount of the dance fees, *id.* at ¶¶ 40, 51; Doe aff., docket no. 26, ex. A, at ¶ 23; Doe aff., docket no. 35, at ¶ 45-46; Dancer Performance Lease, docket no. 14, ex. C, at ¶ 11; Holloway/Moyer/Russman affs., docket no. 14, exs. D, E & F, at ¶ 5; Sime aff., docket no. 18, ex. A, at ¶ 6,  which were the only sum that customers were required to pay in order to receive a dance.

28

It appears, however, that Doe has some control over the amount she earns as a nude dancer. The amounts of the dance *tips* paid to dancers by customers do not appear to be limited in any way, *see* Sime aff., docket no. 18, ex. A, at ¶ 7, and as noted below, Cin-Lan exercised no control over the manner in which dances were performed, which plays at least some role in determining the size of the tips the dancer receives. Further, Cin-Lan asserts that once customers are inside the club, "[t]he entertainers must utilize their own independent initiative to seek out customers and convince customers to purchase [dances] from them." Sime aff., docket no. 36, at ¶ 5. According to Cin-Lan, "often, customers will turn down entertainers who attempt to solicit the purchase of dance performances from them. In fact, there are some customers who do not purchase *any* personal dance performances while they are in the club." *Id.* at ¶ 18. These statements demonstrate that to some extent, a nude dancer's earnings are dependent on her ability to entice customers to purchase her services, either by on-the-spot persuasion or by building up a reputation as a particularly pleasing dancer.

The Court concludes that this factor weighs significantly in favor of Doe. As Doe points out, Cin-Lan controls many aspects of the business that significantly affect the number of customers that will be drawn to its club. It is true that dancers are allowed to promote themselves independently of the club, making it possible that some customers are drawn to the club more by a specific dancer's skill in dancing or in self-promotion than by any of the other features of the club. It is also true that once customers are in the door, the dancers at Cin-Lan's club have the ability to increase their earnings by working hard and skillfully. But by reserving to itself the right to set the amount of the fees customers must pay to receive a dance, Cin-Lan has drastically reduced that ability by preventing more

popular dancers from negotiating for whatever price the market would bear in exchange for their services. Although the size of gratuitous dance tips might be affected by the level of skill a dancer displays, it will also certainly be affected by the amount of cash the customer has on hand and by how generous he happens to be that night -- both of which are largely outside the control of the dancer. As a result, the amount of a nude dancer's tip income depends almost as much on serendipity as on her skill. Further, as discussed above, the rent structure employed by Cin-Lan also mostly eliminates the risk of loss on capital and overhead that the dancers may be forced to suffer if they failed to please their customers sufficiently. Once Cin-Lan's control over every determinant of customer draw *except* the dancing is factored in, indications are that Doe's opportunity for profit and loss is relatively low, and the facts therefore militate in favor of her being an FLSA employee.

<u>v. Extent of Cin-Lan's right to control Doe's work</u>

Doe claims that Cin-Lan required her to "work a minimum number of shifts each week" and that tardiness, absence, or leaving early subjected a dancer to "fine, penalty or reprimand." *Id.* at ¶ 39; *see also* Doe aff., docket no. 26, ex. A, at ¶ 22; Doe aff., docket no. 35, at ¶ 44. The timesheets submitted by the defendants indicate that Doe did not dance at all in a handful of weeks, and that she started and left work at various hours. Simes aff., docket no. 21, exs. A, A-1 & A-2. Cin-Lan's standardized paperwork represents to new dancers that "[a]s an Independent Contractor, you will set your own schedule," docket no. 14, ex. A, at p. 3, and "the amount of 'vacation' time you can take is unlimited," *id.* at p. 4. The affidavits of Cin-Lan's other dancers reflect as much. Holloway/Moyer/Russman affs., docket no. 14, exs. D, E & F, at ¶ 11; Moyer aff., docket no. 36, at ¶ 10; Holloway aff., docket no. 36, at ¶ 11. The Dancer Performance Leases do,

however, require dancers to notify the club one week in advance if they will not be performing at all in a given week, docket no. 14, ex. C and docket no. 36, at ¶ 14, and they provide that dancers may not cancel or change performance dates once they are scheduled. *Id.* The Lease also provides blank spaces for designating a minimum number of hours (called a "set") that a dancer must work per scheduled work date, and a minimum number of sets that a dancer must schedule per week (unless she gives notice that she will not dance at all that week). *Id.* It provides for monetary penalties, styled "lost rent charge[s]," for absenteeism and tardiness with respect to scheduled sets, *id.*, and that two or more such absences in a calendar month are a breach of the lease, *id.* at ¶ 17(c). Nevertheless, Cin-Lan maintains that in reality "entertainers are arriving to perform at all odd times." Sime aff., docket no. 36, at ¶ 9.

The verified complaint also alleges that Cin-Lan "set[s] the hours of operation, the show times during which a dancer may perform [and] the sequence in which a dancer may perform on stage during her 'stage rotation.'" Compl. at ¶ 38; Doe aff., docket no. 26, ex. A, at ¶ 21; Doe aff., docket no 35, at ¶ 41. Doe also states that Cin-Lan determines "the format and themes of [its dancers'] performances (including their costuming and appearances)" and when to hold theme nights requiring special dress of the dancers, and requires that dancers "be on the floor as much as possible when not on stage and mingle with patrons." Compl. at ¶ 38; Doe aff., docket no. 26, ex. A, at ¶ 21; Doe aff., docket no. 35, at ¶¶ 41-43. After collecting a dance fee and performing a dance, Doe asserts that she was required to record the transaction on Cin-Lan's computer system. Compl. at 41; Doe aff., docket no. 26, at ¶ 24; Doe aff., docket no. 35, at ¶¶ 47-48. Cin-Lan denies these claims. Sime aff., docket no. 36, at ¶ 8.

Cin-Lan's standardized paperwork indicates, and Doe here seems to agree, that "[a]s an Independent Contractor, you can perform for whoever you choose, and can reject any customers you want," docket no. 14, ex. A, at p. 3, and that "[t]he Club has no right to direct or control the nature, content, character, manner or means" of dances, Dancer Performance Lease, docket no. 14, ex. C, at ¶ 7; *see also* Doe aff., docket no. 35, at ¶ 19 ("a dancer could never be said to make a 'mistake' while dancing or a 'bad' dance move, and be criticized or reprimanded for it"); Sime aff., docket no. 36, at ¶ 12. Further, it represents that "[t]he Club shall not control in any way the choice of costumes and/or wearing apparel made by Entertainer." *Id.* at ¶ The affidavits of the other dancers corroborate these representations. Holloway/Moyer/Russman affs., docket no. 14, exs. D, E, & F, at ¶¶ 12-13. The lease does, however, give Cin-Lan the right to make such rules for its dancers "as the Club deems necessary" in order to avoid damage to its property, to ensure the safety of its workers and customers, and to comply with relevant laws. Dancer Performance Lease, docket no. 14, ex. C., at ¶ 6. It further contemplates the existence of "an informal tenants association" composed of "all entertainers under lease with the club," and requires a dancer to comply with all rules created by majority vote of those members. *Id.*

On balance, the evidence on this factor is mixed. On one hand, Cin-Lan apparently exercises relatively little control over what Doe actually does on its premises. Her work is dancing, in various stages of undress, for the sexual entertainment of her customers. Although Cin-Lan apparently places some limits on when and how she may do this in its facilities, it has presented significant evidence that their relationship does not permit the defendants to require her to affirmatively do anything at all in this regard. Doe's only

opposing evidence is her assertion to the contrary. As a result, it appears that how and when she dances are for the most part up to Doe. This suggests, at least somewhat, that she is an independent contractor rather than an employee.

On the other hand, it is Cin-Lan alone that dictates how much Doe must charge customers for her dances. This is a particularly significant form of control, since it strikes at the heart of a dancer's financial incentive to work. Additionally, although Cin-Lan offers a fair amount of flexibility in its scheduling, Doe has also shown that it retains some measure of real authority over its dancers' schedules, apparently in order to ensure that it has enough dancers in its club to accommodate its anticipated customer flow. Although this is not a overwhelming indicator of employee status because the level of authority is lower than in the paradigm employer-employee case, it is nonetheless highly relevant. Finally, there is no dispute that Doe was required to immediately and specifically account to Cin-Lan for each dance she performed. This fine-grained level of reporting is more consistent with employee than with independent contractor status.

On balance, the Court concludes that this "degree of control" factor weighs somewhat in favor of Doe's likelihood of proving that she is an employee. Her autonomy in performing her work is undermined too much by Cin-Lan's entirely discretionary control over what she may charge third-party customers.

<u>vi. Importance of Doe's services to Cin-Lan's business</u>

Doe alleges that "the primary reasons the nightclubs exist are to showcase the dancers' physical attributes for customers." Compl. at ¶ 54; Doe aff., docket no. 26, ex. A, at ¶ 39; Doe aff., docket no. 36, at ¶ 60. To even be admitted to the nightclub, she claims, a customer is required to pay a cover charge and additionally purchase a beverage. Doe

aff., docket no. 35, at ¶¶ 57-59.  In fact, she alleges that her club does not even serve alcoholic beverages, and thus lacks the service that most clubs without nude dancers offer. Compl. at ¶ 55; Doe aff., docket no. 26, ex. A, at ¶ 40; Doe aff., docket no. 35, at ¶ 57.

Magistrate Judge Hluchaniuk agreed with this argument, and this Court does as well. The defendants suggest that their dancers are analogous to musicians, who often are integral to the businesses of the venues where they are hired to perform and yet are not "employees" of those venues.  This analogy misses the facts that working as a professional musician typically requires quite a high degree of skill and a substantial investment in both education and musical instruments.  If this were not the case, then if a musician's services were central to the ambience of the bar or concert hall where he or she performed several nights per week, that musician might well properly be considered an FLSA employee.

### 2.  Objection that Cin-Lan's actions were not "Discrimination"

The defendants' claims that they did not "discriminate" against Doe in retaliation for this lawsuit is without merit.  The defendants contend that their actions with respect to Doe simply give her what she is requesting, by treating her as an FLSA employee.  Any difference in the amount of her compensation under the new scheme, they argue, is incidental to this structural change and does not fairly raise an inference of retaliatory intent.  The relevant rule was summed up by the First Circuit:

> An employer may reorganize its affairs and take other necessary employment actions in order to manage the impact of compliance with the outcomes produced by a protected activity so long as it does so for legitimate reasons and not in reprisal for the fact of an employee's participation.  A contrary rule would mummify the status quo and prevent an employer from complying with a court order in the manner that it deems most compatible with the lawful operation of its business.

*Blackie v. Maine*, 75 F. 3d 716, 723 (1st Cir. 1996)

Both the plaintiff and Magistrate Judge Hluchaniuk questioned whether this rule can apply when, unlike in *Blackie*, the defendant actually contests the applicability of the FLSA. The Court finds it unnecessary to rule on this question, however, because Magistrate Judge Hluchaniuk correctly found that the other facts in this case independently preclude the application of the *Blackie* rule here.

The Magistrate Judge noted that the defendants' argument that Doe's conversion to "employee" status and concomitant pay cut are responses to the effect of Doe's suit rather than to the fact that she chose to brought it is weakened by the fact that they have not made a similar structural change with respect to the rest of their nude dancers, who are still currently treated as independent contractors. As a result, he said, the defendants "have singled out plaintiff for differential treatment, under the guise of giving her what she has requested." R&R at p. 29. In their objections, the defendants offer two different explanations for how this is consistent with a non-retaliatory intent. First, they note that of all their dancers, only Doe has filed a lawsuit that would require Cin-Lan to mitigate damages. Second, they suggest that if Doe is in fact an FLSA employee, it may be due to unique aspects of her relationship with Cin-Lan, so that no restructuring would be necessary with respect to the other dancers.

While neither of these explanations for the motive behind defendants' differential treatment of Doe are implausible when considered in the abstract, they are deprived of credibility by the draconian actual terms that Cin-Lan offered her: Specifically, Doe would be required to exchange all of her income from dance fees – which on two nights in April 2008 amounted to nearly $80 per hour – for a $5 per hour wage. Although the $80 figure may or may not be representative, and the plaintiff's assertion in her brief that the new

terms would "reduce[] her income by over 90%," docket no. 26 at p. 17, is not competent evidence[13], Cin-Lan's own affiant corroborates the harshness of the terms of the "employee" relationship that Cin-Lan is now offering Doe when he states that no dancer has ever agreed to perform under them. Sime aff., docket no. 14, ex. C, at ¶ 7. Other dancers also state in their affidavits that they would quit rather than work under these terms. Holloway/Moyer/Russman affs., docket no. 14, exs. D, E, & F, at ¶ 17. On this record, the evidence in favor of inferring a retaliatory nature to Cin-Lan's discriminatory treatment of Doe overcomes a competing inference that her proposed pay cut is an incidental effect of administrative restructuring.

### 3. Conclusion – Likelihood of Success on the Merits

Doe is highly likely to succeed in demonstrating that Cin-Lan's demanded changes to the business relationship between them were "discrimination" against her, in retaliation for her assertion of rights under the FLSA. The severity of Cin-Lan's demands precludes any other explanation.

Doe's has a lesser likelihood of success in proving that she actually is an FLSA employee than her likelihood of proving retaliation, but it is still substantial. She has made only a weak showing of the permanence of her relationship with defendants, but strong showings that only a relatively low degree of skill is required for her dances, and that nude dancers' investments in their work is at best small compared to that of their clubs. The evidence on her potential for profit and loss is mixed, but it also weighs in the direction of

---

[13] It does not seem likely to be accurate, either, since even on Cin-Lan's terms Doe would be permitted to keep any tip income she receives after collecting the mandatory dance fee. The record, however, does not indicate the typical amounts of these tips.

Doe's employee status. She has made a substantial if not overwhelming showing that Cin-Lan controls her work. And it is virtually indisputable that nude dancers are an integral part of the business of the clubs at which they perform. On balance, these factors weigh in favor of a conclusion that Doe is an employee of Cin-Lan under the FLSA.

B.  Irreparable Harm

Cin-Lan argues that a preliminary injunction would be inappropriate because only money damages are at issue here. Although Doe claims she was told that she could be made to mop the floors, and Cin-Lan's standardized employment contract includes a strict non-compete covenant, the defendants have represented that they will not enforce either of these. As a result, they argue, the only retaliation Doe is able to claim is the money damages resulting from a cut in her pay, which, as a matter of law is not irreparable harm. *E.g., Basicomputer Corp. v. Scott*, 973 F. 2d 507, 511 (6th Cir. 1992).

Doe contends that the argument understates what Cin-Lan is actually doing to her. She says that her ability to return to work at the club is conditioned on her taking a pay cut so severe that no other dancer in recent memory has agreed to work under the terms now being offered to her. As a result, she claims that she has been constructively discharged, and forced to seek other employment in Traverse City, Michigan, 170 miles away.

The Court understands the hardships that Doe faces under these circumstances. But as a matter of law, "[t]he fact that an individual may lose his income for some extended period of time does not result in irreparable harm, as income wrongly withheld may be recovered through monetary damages in the form of back pay." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F. 3d 566, 579 (6th Cir. 2002). Only in cases of extreme hardship, such as where a plaintiff risks losing his or her business or running out

of funds to prosecute a lawsuit, will the loss of one's job qualify as irreparable harm for preliminary injunction purposes. *Roland Machinery Co. v. Dresser Inds., Inc.*, 749 F. 2d 380, 386 (7th Cir. 1984). Although the plaintiff has adduced evidence as to the hardship she suffers from not being able to work at Cin-Lan, it does not rise to this exceptional level.

Doe also represents that she has been unable to find work as a nude dancer at other nightclubs in the area, and as a result claims that she has been "blacklisted" by Cin-Lan in retaliation for filing this suit. Doe aff., docket no. 26, ex. A, at ¶¶ 51-53. While being totally deprived of the ability to work at one's chosen occupation might qualify as irreparable harm for purposes of a preliminary injunction,[14] the Court finds that Doe has not made such a showing here. Doe does not claim personal knowledge of any steps taken to blacklist her, but instead infers such an act from her being turned away (which she claims is unusual) on a single occasion when she tried to find work at another nightclub featuring nude dancers. *Id.* Further, the defendants have produced an affidavit from a manager of the nightclub where Doe inquired, who claims that it was Doe's attorney who, after introducing himself as her attorney, made the initial inquiry about finding work for her (without referencing this litigation). Biswas aff., docket no. 29, ex. A, at ¶ 3, 6. Under such "extremely odd" circumstances, *id.* at ¶ 7, it is not surprising that the managerial staff concluded that they had all the dancers they needed, *id.* at ¶¶ 5, 8, whether or not they would have made the same decision with respect to another applicant. This would seem to be a more likely explanation for a single nightclub turning Doe away than some

---

[14] On the other hand, this deprivation would not be any worse than the extended and total loss of income regarded as insufficient by the *Overstreet* court. 305 F. 3d. at 579.

hypothetical blacklisting for which no direct evidence exists, and which Cin-Lan's affiant specifically denies. *Id.* at ¶ 9.

Doe has not claimed that she has made any other efforts to find other work, which might have served as a further test of her blacklisting theory. In fact, she stated that she is reluctant to apply to other clubs in the area because they all serve alcoholic beverages, "a situation [she is] generally uncomfortable with." Doe aff., docket no. 26, ex. A, at ¶ 45. On the present record, the Court is unable to find Doe's blacklisting claim to be anything more than speculation. Although Doe's discomfort with dancing in clubs where alcoholic drinks are served is understandable, the Court does not regard it as sufficient, standing alone, to warrant the issuance of a preliminary injunction.

Doe additionally urges that in the employment-law context, retaliation for the exercise of protected rights is itself irreparable harm, because it inevitably chills the exercise of those rights. This appears to be the law in the Ninth Circuit, which held in *Arcamuzi v. Cont. Air Lines, Inc.*, 819 F. 2d 935, 938-39 (9th Cir. 1987) that "allegations of retaliation for the exercise of statutorily protected rights represent possible irreparable harm far beyond economic loss. This is because retaliatory action for protected activity carries with it the risk that employees may be deterred from engaging in legitimate conduct." (Citing *Garcia v. Lawn*, 805 F. 2d 1400, 1405-06 (9th Cir. 1986)). The Sixth Circuit, however, has at the very least rejected a *per se* rule of the kind Doe advocates. In *EEOC v. Anchor Hocking Corp.*, 666 F. 2d 1037(6th Cir. 1981), the court acknowledged that a chilling of *other* employees' cooperation with an EEOC investigation could, but would not inevitably, qualify as irreparable harm *to the EEOC. Id.* at 1043-44. The Court's holding was at best unclear as to whether a chilling effect could *ever* qualify as irreparable harm to a private plaintiff;

in affirming the district court's denial of a preliminary injunction, the circuit "agree[d] with the district court that the statutory remedies of reinstatement and back pay will adequately redress [the plaintiff's] injury if his retaliation claim is successful." *Id.* at 1044.

Whether this authority permits Doe to prove irreparable harm by showing a retaliatory "chill" upon her or other nude dancers' ability to enforce any FLSA rights they might have is questionable. At least the First and Second Circuits seem to have adopted that test. *See Holt v. Cont. Gp., Inc.*, 708 F. 2d 87, 90-91 (2d Cir. 1983) (in a Title VII case, no "presumption of irreparable injury in every action by a plaintiff alleging a retaliatory discharge," but "the risk of weakened enforcement . . . is a factor properly to be weighed by a district court in assessing irreparable injury"); *DeNovellis v. Shalala*, 135 F. 3d 58, 64 (1st Cir. 1998) ("It cannot be the rule that irreparable injury may be established simply by bringing a retaliation claim and then saying that interim relief is necessary to prevent others from being intimidated from contributing to the plaintiff's case or from filing their own claims.").

Even if irreparable harm can be proven in this fashion, however, the facts of this case give unlikely rise to a conclusion that Cin-Lan's retaliation will unduly dampen the enthusiasm of Doe's fellow dancers in cooperating with her litigation.  Under ordinary circumstances, a worker who sees harsh terms imposed in response to a lawsuit brought by one of his or her colleagues might expected to think twice about cooperating in the suit, or bringing his or her own.   But here, many of the dancers other than Doe have already agreed by contract[15] that, should they claim or be adjudicated to be employees of Cin-Lan,

---

[15]  Two of these contracts are in the record, and Cin-Lan claims that all its dancers sign them. Doe denies that claim, but only in a conclusory fashion.

their relationship with Cin-Lan will immediately convert to the very terms that Cin-Lan is offering Doe here.[16]  Thus, Cin-Lan's alleged retaliation against Doe has not changed the situation of these other dancers in any significant respect.

In any event, the record on this motion includes no showing of any chilling effect. Although Doe claims to be suffering the personal hardships of a reduced income and being forced to maintain two residences more than 100 miles apart, she has given no indication that these difficulties have somehow impaired her access to the courts.  And she has not claimed in any way that any of her colleagues have been or potentially will be deterred from cooperating by the retaliation.  As a result, "[t]here are no facts here to support anything other than a hypothetical chilling effect, and that is plainly inadequate."  *DeNovellis*, 135 F. 3d at 65.

In sum, the Court concludes that Doe has made a weak showing of irreparable harm should a preliminary injunction be denied.

### C.  Harm to Defendants

Cin-Lan argues several theories for how it would be harmed by the issuance of an injunction recommended by the Magistrate Judge.  Cin-Lan claims that because the recommended relief would require the parties to treat $13 of each $20 dance fee as a "tip,"

---

[16]  Doe's colleagues are not therefore permitted to contractually "opt out" of employee status under the FLSA.  If the substance of their relationship with Cin-Lan is that of employer and employee, then their status exists regardless of the contractual label they place on it.  The point is that the other dancewrs are not likely to be deterred from cooperating in the lawsuit by the terms Cin-Lan has dictated to Doe because they already knew that they would face those terms if they were parties to a suit like this one.

its adoption would harm the defendants in two different ways. First, if Cin-Lan is unable to record Doe's portion of these monies on its books, it will be unable to make the withholdings required by federal law if they turn out instead to be wages, as would be the case if Doe is an "employee" for purposes of the Internal Revenue Code as well as the FLSA. Second, under the FLSA an employer can count only half of an employee's tips toward the minimum wage it would owe her, whereas any wages it pays would obviously count fully toward the minimum wage requirement.

Third, the defendants object that Magistrate Judge Hluchaniuk's recommendation that they be ordered to permit Doe to work the same schedule she did previously is harmfully vague, because prior to filing this lawsuit Doe had no fixed schedule – she could work (or not work) when she wanted. Fourth, they object that because the recommended injunction would prevent them from completely reclassifying Doe as an employee, it improperly ignores their request that she be equitably estopped from continuing to run up her damages claim.

The plaintiff says that these objections lack merit for a variety of reasons. Here, the Court will limit itself to noting that each of them is relevant only to the appropriate form of relief, rather than to the question of whether Doe is entitled to a preliminary injunction in the first place. If it becomes necessary, the objections could be addressed by a careful refashioning of the relief rather than an outright denial. Because the Court will deny the preliminary injunction motion on other grounds, however, no further consideration of this argument is required.

D. The Public Interest

Magistrate Judge Hluchaniuk concluded that the public interest favors the grant of a preliminary injunction. Defendants make no objections to this finding, and thereby waive all further review of it.

E. Conclusion– Preliminary Injunction Factors

With respect to her FLSA retaliation claim, the Court finds Doe substantially likely to succeed on the merits, but that she has made and insufficient showing that she will be irreparably harmed if a preliminary injunction does not issue. The defendants would not be significantly harmed by an injunction, and the public interest is somewhat in favor of it. The Court regards the absence of irreparable harm, however, to weigh conclusively against issuing an injunction.

CONCLUSION AND ORDER

The Court is without jurisdiction to order Cin-Lan to pay Doe a minimum wage, as recommended by Magistrate Judge Hluchaniuk. The Court further concludes that Doe failed to show that she will suffer irreparable harm without the issuance of an injunction and that an injunction is therefore not appropriate on this record and at this stage of the litigation.

**WHEREFORE**, Magistrate Judge Hluchaniuk's report and recommendation is **REJECTED**, and plaintiff's emergency motion for a preliminary injunction is hereby **DENIED.**

s/Stephen J. Murphy, III
Stephen J. Murphy, III
United States District Judge

Dated: November 20, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 20, 2008, by electronic and/or ordinary mail.

Alissa Greer_____
Case Manager