# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JANE DOE, individually, and on behalf of all others similarly situated, | Case No. 4:08-CV-12719-PVG-MJH |
| Plaintiff, | Honorable Stephen J. Murphy III |
| v. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS DÉJÀ VU CONSULTING, INC.'S AND HARRY V. MOHNEY'S MOTION FOR SUMMARY JUDGMENT** |
| CIN-LAN, INC.; DÉJÀ VU CONSULTING, INC.; and HARRY V. MOHNEY | |
| Defendants. | |

SOMMERS SCHWARTZ, P.C.
BY: JASON J. THOMPSON (P47184)
2000 Town Center, Suite 900
Southfield, Michigan 48075
Telephone: (248) 355-0300
E-Mail: jthompson@jta-law.com

ZIMMERMAN REED, P.L.L.P.
BY: TIMOTHY J. BECKER, (MN BAR 256663)
651 Nicollet Mall, Suite 501
Minneapolis, Minnesota 55402
Telephone: (612) 341-0400
E-Mail: tjb@zimmreed.com

ZIMMERMAN REED, P.L.L.P.
BY: HART L. ROBINOVITCH, (AZ BAR 020910)
14646 N. Kierland Blvd., Suite 145
Scottsdale, Arizona 85254
Telephone: (480) 348 6400
E-Mail: hlr@zimmreed.com

*Attorneys for Plaintiff*

HERTZ SCHRAM, PLLC
BY: WALTER J. PISZCZATOWSKI, (P-27158)
1760 South Telegraph Road, Suite 300
Bloomfield Hills, Michigan 48302
Telephone: (248) 335-5000
E-Mail: wallyp@hertzschram.com

*Attorney for Defendant Cin-Lan, Inc.*

LAW OFFICES OF EDI THOMAS
BY: EDITH A. THOMAS, (P-41172)
214 North Ridge Drive, Suite B
Fallbrook, California 92028
Telephone: (888) 349-3940
E-Mail: edithomas1@aol.com

*Attorney for Defendants Déjà Vu Consulting, Inc. and Harry V. Mohney*

CLARK HILL, PLC
BY: KRISTIN BEALS BELLAR, (P69619)
    RONALD A. KING, (P45008)
313 East Grand River Avenue
Lansing, Michigan 48906
Telephone: (517) 318-3100
Email: kbellar@clarkhill.com
    rking@clarkhill.com

CLARK HILL, PLC
BY: PAUL W. COUGHENOUR, (P34335)
500 Woodward Avenue
Detroit, Michigan 48226-3435
Telephone: (313) 965-8300
Email: pcoughenour@clarkhill.com

*Attorney for Defendants Déjà Vu Consulting, Inc.*

## TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iiv

Statement of Question Presented ..................................................................................... vi

Statement of Controlling or Most Appropriate Authorities ......................................... vii

I.    Introduction ................................................................................................... 1

II.   Statement of Relevant Facts ......................................................................... 2

      A.    Origin of Defendants' Exotic Dance Nightclub Business ...................... 2

      B.    Overview of the Relationships Between Defendants and Their Affiliates. ........... 3

      C.    Corporate Structure of the Enterprise .................................................... 4

            1.    Cin-Lan, Inc. ................................................................................ 4

            2.    Imagination Corporation. ............................................................ 4

            3.    Déjà Vu Consulting, Inc. ............................................................. 5

            4.    Modern Bookkeeping, Inc. .......................................................... 6

            5.    MIC, Ltd. ..................................................................................... 6

            6.    Dynamic Industries and the Durand Trust ................................. 7

            7.    All of the Key Witnesses "Wear Many Hats" ............................ 8

      D.    Facts In The Record Show That DVC and Mohney Act In The Interest of Déjà Vu
            Nightclubs, Like Cin-Lan. ...................................................................... 8

            1.    DVC Provides Far More than Mere Advice: It Has been Delegated the
                  Entire Senior Management Function of Cin-Lan. ...................... 8

            2.    DVC and Mohney Have The Ability to Hire and Fire Cin-Lan's Workers,
                  Managers and Officers. ............................................................ 10

            3.    Both DVC and Mohney Are Intimately Involved in the Decisions to
                  Classify Dancers as Independent Contractors. ......................... 11

            4.    DVC and Mohney Publish a Manual Explaining The Operating
                  Procedures That Apply to Club Management and Exotic Dancers. ......... 12

i

5.      Mohney Monitors and Scrutinizes the Work of the Exotic Dancers. ....... 12

6.      Mohney Scrutinizes Financial Reports Of The Nightclubs. Addressing The Dancer's Financial Performance. ............................................................. 13

7.      Mohney Scrutinizes the Physical Facilities of The Nightclubs Where the Dancers Work and Determines Necessary Changes ................................ 14

III.    Applicable Standard For Summary Judgment ................................................... 14

IV.     Argument ........................................................................................................... 15

        A.      Defendants' Initial Arguments Are Misplaced Becuase They Do Not Address The Joint Empoloyer Issue Before The Court............................................................. 15

                1.      Plaintiff Need Not Pierce the Corporate Veil or Prove That Cin-Lan is Insolvent  In Order to Proceed Against DVC and Mohney. .................... 15

                2.      Defendants' "Enterprise Liability" Argument Is Misplaced. ................... 16

                3.      Plaintiff Does Not Lack Standing to Sue DVC or Mohney..................... 16

        B.      Defendants Read The Applicable Legal Standard For Joint Employer Status Too Narrowly. ........................................................................................................ 16

                1.      Both The FLSA and MWL Contemplate There Being Several Simultaneous  "Joint Employers" Of A Worker...................................... 16

                        a.      Corporate Officers Are Typically Joint Employers. .................... 18

                        b.      Management Companies and Consultants Are Joint Employers.. 18

                        c.      The "Top Man" and Primary Shareholder of a Closely-Held Family  of Companies is A Joint Employer................................. 19

                2.      The Standard For Joint Employer Status Under The MWL Is The Same. 21

                3.      Where Facts Show That Joint Employers' Act In Each Others' Interests And Simultaneously Control The Workplace, The Economic Realities Establish The Misclassification Of Workers By All................................. 21

        C.      Facts Establish That DVC Is A Joint Employer. .................................................. 22

                1.      The Skeletal Facts Which Defendants Present in Their Supporting Declarations Are Misleading. .................................................................. 22

2. Facts Confirm That DVC Has Substantial Control Over the Terms and Conditions of the Dancer's Workplace. ...................................................... 23

 a. DVC exercises control over the workplace and conditions of employment.................................................................................... 23

 b. DVC has the ability to hire and fire workers ................................ 24

 c. DVC is involved in determining the rate and method of payment ........................................................................................................ 24

 d. DVC maintains and/or has access to dancers' employment records. ........................................................................................................ 25

D. Facts Establish That Harry Mohney Is A Joint  Employer. .................................. 26

 1. Mohney has control over the workplace and conditions of employment. 26

 2. Mohney has the ability to hire and fire workers ...................................... 28

 3. Mohney determines of the rate and method of pay.................................. 28

 4. Mohney has access to dancer employment records. ................................ 28

V. Conclusion .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

AMW Inv. v. Commissioner, 1996 WL 270942 (U.S. Tax Ct.)...................................................... 3

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........................................................ 15

Chambers Const. Co. v. Mitchell, 233 F.2d 717 (8th Cir. 1957).................................................... 29

Déjà Vu Inc. v. Commissioner, 1996 WL 270943 (U.S. Tax Ct.)................................................ 27

Dep't of Labor v. Cole Enterprises, Inc., 62 F.3d 775 (6th Cir. 1995)............................. 17, 18, 29

Dole v. Elliott Travel, 942 F.2d 962 (6th Cir. 1991) ........................................................... passim

Donovan v. Agnew, 712 F.2d 1509 (1st Cir. 1983)......................................................... 16, 18, 29

Donovan v. Brandel, 736 F.2d 114 (6th Cir., 1984) .................................................................. 22

Donovan v. Grim Hotel Co., 747 F.2d 966 (5th Cir. 1984)......................................... 19, 20, 26, 29

Donovan v. Janitorial Services, Inc. 672 F.2d 528 (5th Cir. 1982) ......................................... 20, 29

Donovan v. Sabine Irrigation Co., 695 F.2d 190 (5th Cir. 1983) .................................................. 18

Donovan v. Tavern Talent and Placements, Inc., 1986 WL 32746 (D. Colo. 1986).. 19, 21, 25, 26

Ellwest Stereo Theatres of Memphis, Inc.v. Commissioner, 1995 WL 760499 (U.S. Tax Ct.)..... 7

Eyefull Inc. v. Commissioner, 1996 WL 270936 (U.S. Tax Ct. 1996) ........................................ 27

Falk v. Brennan, 414 U.S. 190, 195 (1973) ........................................................................... passim

Fegley v. Higgins, 19 F.3d 1126 (6th Cir.), cert denied, 513 U.S. 875 (1994) ............................ 29

Finke v. Kirtland Cmty Coll. Bd. of Tr., 359 F.Supp.2d 593 (E.D. Mich.2005)................... 18, 29

Goldberg v. Whitaker House, 366 U.S. 28 (1961)...................................................................... 17

Helvering v. Clifford, 309 U.S. 331 (1940) ................................................................................ 5

Kidder v. Miller Davis Co., 564 N.W.2d 872 (Mich. 1997)....................................................... 21

Mantei v. Michigan Public School Emp., 663 N.W.2d 486 (Mich. 2003) .................................. 18

McDonald v. JP Marketing Assoc., 2007 WL 1114159 (D.Minn.,2007)....................................18

Mendez v. Brady, 618 F.Supp. 579 (W.D. Mich. 1985)........................................................20, 28

Patel v. Wargo, 803 F.2d 632 (11th Cir., 1986)..........................................................................16

Reich v. Circle C Investments, Inc., 998 F.2d 324 (5th Cir.1993) ......................................passim

Reich v. Priba Corp., 890 F.Supp. 586 (N.D.Tex. 1995).......................................20, 29, 30

Rodgers v. Banks, 344 F.3d 587 (6th Cir.2003) ........................................................................15

Sims v. Parke Davis, 334 F.Supp. 774 (E.D. Mich. 1971) .........................................................21

Tullous v. Texas Aquaculture Processing Co., 579 F.Supp.2d 811 (S.D.Tex. 2008)..................18

U.S. v. Klien, 19 F.3d 20 (6th Cir. 1994) ....................................................................................7

U.S. v. Mohney, 723 F.Supp. 1197 (E.D.Mich.1989), rev'd 949 F.2d 899 (6th Cir. 1991).........27

U.S. v. Rosenwasser, 323 U.S. 360 (1945).................................................................................17

U.S. v. Stanley, 416 F.2d 317 (2d Cir. 1969) .............................................................................29

Usery v. Godwin Hardware, 426 F.Supp. 1243 (W.D. Mich. 1976) ....................................19, 29

Usery v. Weiner Bros., Inc., 70 F.R.D. 615 (D.Conn.1976).......................................................18

Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir., 2003) .......................................................18

**Statutes**

29 C.F.R. § 791.2 ..................................................................................................................17, 18

Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.* ..................................................................1, 22

Michigan Minimum Wage Law, MCL §408.381 *et seq.* ...........................................................1, 22

## <u>STATEMENT OF QUESTION PRESENTED</u>

Whether, in light of the facts, Defendants Déjà Vu Consulting, Inc. and/or Harry V. Mohney are Plaintiff's "employers," as Plaintiff is required to establish a necessary element of liability under the Fair Labor Standards Act and the Michigan Wage Law.

      Defendants answer:         No

      Plaintiff answer:           Yes

      The Court should answer:    Yes

## STATEMENT OF CONTROLLING
## <u>OR MOST APPROPRIATE AUTHORITIES</u>

Pursuant to LR 7.1(c)(2), Plaintiff states that the controlling or most appropriate authorities are 29 U.S.C. § 203(d); M.C.L. §408.382(b),(c); <u>Falk v. Brennan</u>, 414 U.S. 190 (1973); <u>Dole v. Elliott Travel</u>, 942 F.2d 962 (6th Cir. 1991); <u>Dep't of Labor v. Cole Enterprises, Inc.</u>, 62 F.3d 775 (6th Cir. 1995); <u>Donovan v. Grim Hotel Co.</u>, 747 F.2d 966 (5th Cir. 1984); <u>Donovan v. Janitorial Services, Inc.</u> 672 F.2d 528 (5th Cir. 1982); <u>Reich v. Circle C Investments, Inc.</u>, 998 F.2d 324 (5th Cir.1993); <u>Reich v. Priba Corp.,</u> 890 F.Supp. 586 (N.D.Tex. 1995); <u>Donovan v. Tavern Talent and Placements, Inc.</u>, 1986 WL 32746 (D. Colo. 1986).

## I.      INTRODUCTION

Contrary to Defendants Déjà Vu Consulting's ("DVC") and Harry Mohney's ("Mohney") contentions, the facts in this case clearly establish that both are "joint employers" of dancers working at the Michigan Déjà Vu Nightclubs under the expansive tests in the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.* ("FLSA") and Michigan Minimum Wage Law, MCL §408.381 *et seq.* ("MWL").   Under both statutes a person or entity is considered a "joint employer," who is jointly and severally liable for violations of the wage and hour laws with the worker's nominal employer, simply if they are someone who acts "directly ***or indirectly*** in the interest of an employer in relation to an employee...." 29 U.S.C. § 203(d)(emph. added); see also M.C.L. §408.382(c).   Given the FLSA's expansive language, the United States Supreme Court has long confirmed that the Act contemplates there being several "joint employers" who may be simultaneously responsible to workers for statutory violations.   Falk v. Brennan, 414 U.S. 190, 195 (1973).   Under the applicable test, joint employer status is found where: (1) the person or entity has operational control over the enterprise of which the nominal employer is part, or (2) where the person has substantial control of the terms and conditions of the work of the employee. This test in no manner involves piercing the corporate veil, as Defendants suggest.   In turn, Courts routinely find corporate officers, shareholders, owners, separate management companies and business "consultants" to be joint employers, who are jointly and severally liable to employees, along with the worker's nominal employer, for any violation of the wage and hour laws.   In fact, in a number of cases involving the misclassification of exotic dancers, owners and "consultants" of adult nightclubs have been found to be joint employers.

While discovery is not complete, and evidence has been withheld requiring Plaintiff to file an affidavit pursuant to Fed.R.Civ.P. 56(f), facts obtained thus far clearly support Plaintiff's claims that both DVC and Mohney are joint employers of the dancers as both have been responsible for controlling and maintaining the business model employed at the Déjà Vu nightclubs where dancers are misclassified as independent contractors.   Despite surface appearances, and attempts to obfuscate their true roles, facts show that DVC and Mohney act in

1

the interest of the Michigan Déjà Vu nightclubs regarding key business policies affecting dancer classification and work conditions and therefore, are joint employers.  As a result, if summary judgment is granted for any party on this issue, it should only be Plaintiff.

## II.        STATEMENT OF RELEVANT FACTS

### A.        Origin of Defendants' Exotic Dance Nightclub Business

Harry Mohney entered into the exotic dance nightclub business in the mid-1980's when he purchased the original "Déjà Vu" adult nightclub in Seattle, Washington.  Since that time Mohney has opened numerous other "Déjà Vu" nightclubs in several states.  Mohney Dep. at 159-164 (Exh. 1)[1].  To this day, the predominant business purpose of each nightclub remains the same -- to showcase exotic dancers for customers. St. John. Dep. at 171-72 (Exh. 2).  The primarily business model at each nightclub also remains the same: to classify all exotic dancers working there as independent contractors, as opposed to employees; pay them no wages; but instead have the dancers actually pay the nightclub "rent" to work by splitting the money given to them by patrons with the nightclub.  While the nightclubs also earn revenue by charging admission prices and selling beverages, the "rent" paid by the dancers remains one of, if not the primary source of revenue for the nightclubs.  Mohney Dep. at 197 ("rent" can be up to 50% of nightclub revenues); Cin-Lan Income Statement. (Exh. 25). While Defendants claim that the business model classifying dancers as independent contractors was in place at the original Seattle nightclub when it was acquired, and remains "well-established industry practice," all three Defendants have since discussed the classification system in light of the labor laws and made the specific decision to adopt and "carry forward" that model in all Déjà Vu nightclubs.  Mohney Dep. at 159-172; Krontz at 104-05, 163 (Exh. 3); Defs' Response to Interrog. No. 1 (Exh. 4).

For licensing and other legal reasons Mohney has avoided holding the nightclubs and related adult businesses directly in his own name.  As a result, he shifted his ownership interests

---

[1]    All Exhibits ("Exh.") referenced herein are to the exhibits appended to the Second Affidavit of Hart Robinovitch dated July 24, 2009.

to family members.[2] Despite this, Mohney continues to exercise the highest executive authority with respect to each of the companies.  Mohney Dep. at 51-52. (Exh. 1)

      **B.**      **Overview of the Relationships Between Defendants and Their Affiliates.**

During the relevant time period there have been nine Déjà Vu Nightclubs operating in Michigan; Lansing, Ypsilanti, Flint, Highland Park, Saginaw, Detroit, Port Huron and two in Kalamazoo.  Currently, at least seven remain in operation.  Mohney Dep. at 25-26, 110 (Exh. 1); St. John Dep. at 59-62, 129-35 (Exh. 2).

Each nightclub has a common structure where it is held by a nominal corporation (e.g., Cin-Lan, Inc.) but all senior management, financial, legal and other critical functions are delegated to affiliated companies (such as DVC) which all come under the common control of Mr. Mohney.  All or the vast majority of shares in each nightclub corporation are ultimately held by Mohney and/or his personal trust; the senior management functions of each nightclub corporation are delegated to Déjà Vu Consulting, a company held indirectly by Mr. Mohney's family trust; all financial and bookkeeping services are delegated to Modern Bookkeeping, Inc., another company owned by the Mohney family trust; all of the nightclubs' physical facilities are leased from yet another company owned by the same Mohney family trust.  See generally St. John Dep. at 80-104 (Exh. 2).  All profits from the companies within the enterprise are ultimately up-streamed to Mohney and/or his children.  Mohney Dep. at 101, 189 (Exh. 1).

None of the transactions and dealings between the companies occur at arm's-length. Rather, as described below, all of the companies have common officers, directors and owners who deal amongst themselves while simultaneously "wearing many hats."

---

[2]   Mohney Dep. at 77-78, 116 ("'But I think part of it was licensing issues, so I gave my interest in the [Durand] Trust to the children and grandchildren.'…'It [convictions] debilitated me, it didn't do anything to them.'").  See AMW Inv. v. Commissioner, 1996 WL 270942 (U.S. Tax Ct.)("As Mr. Mohney's business dealings evolved over time and he began to gain greater notoriety, his reputation as a proprietor of adult entertainment establishments preceded him and affected the future expansion of his business operations into new communities.  Mr. Mohney decided to purchase property through nominees due to his concerns that he would encounter legal problems if he purchased property in his own name.")(Exh.5).

### C.   Corporate Structure of the Enterprise

The following entities and persons comprise a single enterprise under 29 U.S.C. §203(r) as they perform related activities through common control for a common business purpose.

### 1.   Cin-Lan, Inc.

Cin-Lan, Inc. ("Cin-Lan") is the company that owns the Déjà Vu nightclub in Lansing, Michigan where Plaintiff worked.   All of Cin-Lan's stock is owned by Imagination Corp. ("Imagination"), a company owned by Mohney and/or his personal revocable trust.  Defs' Resp. to Interrog. No. 4 (Exh. 4); Mohney Dep. at 99-100.   Cin-Lan's president, sole officer and sole director is Dennis Krontz, a resident of California.   Defs' Resp. to Interrog No. 4.   Krontz, however, spends very little time working for Cin-Lan and has few direct responsibilities.  Krontz Dep. at 101, 110, 166-168 (testifying that he possibly spends less than 50 hours a year working on behalf of Cin-Lan ..."its ten minutes here, ten minutes there.").   Instead, Cin-Lan employs a general manager (Tom Sime) to handle the lower-end management functions at the nightclub and outsources all senior management and policy functions to Déjà Vu Consulting.   In turn, Krontz, the sole officer and director of a company, whose gross annual revenues exceed $3 million and whose profits exceed $1 million, is paid a mere $1,200 a year for his services.   Krontz Dep. at 156-66, 172-73 (Exh. 3).   The net profits all flow to Harry Mohney through Imagination Corp.

### 2.   Imagination Corporation.

Imagination Corp. is a company owned by Harry Mohney and/or the Harry V. Mohney Revocable Trust.[3] Mohney Dep. at 96-97, 99-100 ("I own the stock in Imagination"..."100 percent of the stock." (Exh. 1); Krontz Dep. at 96, 167 (Exh. 3).  Besides Cin-Lan, Imagination holds the majority ownership of all other Déjà Vu Nightclubs in Michigan, except the alcohol-licensed nightclub in Kalamazoo which is held in the name of Mr. Mohney's son, Jason Mohney.

---

[3]   A fundamental aspect of a revocable trust is that the grantor retains dominion over the property in the trust.  See generally Helvering v. Clifford, 309 U.S. 331 (1940).  Hence, all shares of, and assets held by Imagination through the Harry V. Mohney Revocable Trust are still considered Mr. Mohney's property.

Mohney Dep. at 104-07; St. John Dep. at 60-62 (Exh. 2).  The net profits of those companies flow through to Mr. Mohney.  Mohney Dep. at 189.

The officers of Imagination are Donald Krontz, Harry Mohney and his daughter, Mary Beth Mohney.  Krontz Dep. at 178-181.  Krontz, however, as the company's president is paid no salary and does very little work for the company.  Krontz Dep. at 175, 186 ("Q.  How many hours a year do you put into working for Imagination Corp.? A. Not many.") (Exh.3).  Mary Beth Mohney, while paid a salary, has no active job functions.  Krontz Dep. at 181-86; Mohney Dep. at 85.  The only other "employee" of the company is Harry Mohney's young son, Justin Mohney who also has no job functions despite drawing a salary.  Krontz Dep. at 146.

As Mr. Krontz's testimony reveals, he is simply a nominal officer and director who is paid nothing to do essentially nothing.  While Krontz holds the title of "president" he does not know if he ever sees the company's profit and loss statements; does not know what the company's "employees" do ("I'm not sure.") or are paid ("Never been interested"); during the last ten years he has never talked to the company's employees about its performance; and does not know why the company employs people who do no work for the company.  Krontz. Dep. at 178-86.  In truth, the company is nothing but an instrumentality of Mr. Mohney.

### 3.      Déjà Vu Consulting, Inc.

DVC was formed in 1994 when the nightclub "consulting" arm of a related company, "Déjà Vu, Inc.," "was kind of branched off" for tax reasons.  Krontz Dep. at 57-68.  DVC currently provides management consulting services to each of the Déjà Vu nightclubs in Michigan and also licenses various "Déjà Vu" trademarks to the clubs.  DVC has identical "consulting" and "licensing" contracts with Cin-Lan and each Déjà Vu nightclub under which each club pays DVC significant monthly fees (i.e., approximately $17,250 per month in the case of Cin-Lan).  See e.g. "Consulting Agreement" (Exh. 6); Licensing Agreement (Exh. 7).  Hence, Cin-Lan pays its own officers and directors less than 1% of what it pays DVC for "consulting" services.  As described more fully below, DVC establishes policies which confirm that it controls

5

the workplace at all of the Déjà Vu nightclubs in Michigan, including that pertaining to the classification of dancers.  Krontz Dep. at 105; Mohney Dep. at 169-70.

All of DVC's stock is held by Dynamic Industries, which in turn is owned by Mr. Mohney's family trust, the Durand Trust.  Mohney Dep. at 57-68.  DVC's only officers are President Jim St. John, Vice-President, Donald Krontz and Treasurer, George Couch (who is Mohney's son-in-law and also the manager of the Déjà Vu nightclub in Flint). Resp. to Interrog. 4; St. John Dep. at 23, 135.  DVC employs a number of "consultants" including Mohney, his son Jason Mohney and several other family members.  Through a common paymaster, DVC pays Mohney a salary that is more than triple that of the company's Vice-President, Krontz.  Mohney Dep. at 182-87; Krontz Dep. at 187.

### 4.   Modern Bookkeeping, Inc.

DVC and all of the Déjà Vu nightclubs contract with Modern Bookkeeping, Inc. ("Modern") for financial, bookkeeping, payroll and other support services. Mohney Dep. at 89-93.  Like DVC, 100% of Modern's stock is owned by Dynamic Industries.  Paulette Held, a bookkeeper, serves as its president. Id.  Besides performing bookkeeping services, most corporate records of Cin-Lan, DVC and Mohney are maintained at Modern and/or shared on a common computer system.  Sime Dep at 110-16. (Exh. 8); Krontz Dep. at 111-12; Moheny Dep. at 90-93, 128; Hall Dep. at 79, 89, 109. (Exh. 9); St. John Dep. at 23, 29, 186-189.[4]

### 5.   MIC, Ltd.

MIC, Ltd. ("MIC") is a company which owns and leases the building space which the Michigan Déjà Vu nightclubs, including Cin-Lan, operate out of.[5]  St. John Dep. at 102, 134-37

---

[4]     See U.S. v. Klien, 19 F.3d 20 (6th Cir. 1994)(describing Modern Bookkeeping as "the nerve center for Mohney's adult entertainment empire").

[5]     St. John is the President and sole director of yet another company, International Amusement, Ltd. (f/k/a Otis Mohney, Inc."), which provides sound and lighting equipment, as well as construction and repair services for the Déjà Vu nightclubs, including Cin-Lan.  St. John Dep. at 11-12, 32-35; Mohney Dep. at 213.  International Amusements is owned by Imagination Corp., and hence, is actually owned and controlled by Harry Mohney.  Mohney Dep. at 49-50, 212-213.

(Exh. 2).  MIC's president is Jim St. John.  Like DVC and Modern, MIC is owned by Dynamic Industries and hence, by the Mohney family trust.  While Mr. St. John concedes that Harry Mohney is the company's only employee, charged with finding new properties to buy, neither St. John nor Mohney have any understanding as to MIC's actual holdings; if the properties it holds were acquired from Mr. Mohney at arms-length (including the building in Lansing that Cin-Lan leases); or whether MIC has ever purchased properties from a third-party other than Mr. Mohney.[6]  St. John Dep. at 102-106 (Exh. 2); Mohney Dep. at 118-124 (Exh. 1).

### 6.    Dynamic Industries and the Durand Trust

Dynamic Industries holds all of the stock in DVC, Modern and MIC.   Strangely, neither Mr. Mohney nor Mr. St. John knows who any of the officers, directors, or employees of Dynamic are.  Mohney Dep. at 57-68; St. John Dep. at 39.   What *is* known is that Mohney voluntarily transferred his interests in Dynamic to his family trust, the Durand Trust.  Mohney Dep. at 57-68, 77-78.  The trustee of the Durand Trust is Paulette Held, and the beneficiaries are Mohney's children.  Mohney Dep. at 79.  Rather than allow Plaintiff the opportunity to conduct discovery to determine if Ms. Held is merely a nominee who makes decisions regarding those companies in consultation with Mr. Mohney, Defendants filed a motion for a protective order attempting to block Ms. Held's deposition and to quash Plaintiff's request for production of documents seeking correspondence between Ms. Held, Mr. Mohney and other relevant witnesses.  See Docket 86.  Once uncovered, Plaintiff expects the facts to show that Mr. Mohney has considerable input and managerial control over Ms. Held, Dynamic Industries, companies it holds like DVC, and the Durand Trust.

---

[6]  Ellwest Stereo Theatres of Memphis, Inc. v. Commissioner of Internal Revenue, 1995 WL 760499 at *2 (U.S. Tax Ct. 1996)(confirming that MIC, Ltd. was a company "owned, in whole or part, by Harry V. Mohney, either directly or indirectly as one of several beneficiaries of a trust"  and The Durand Trusts also owned all the stock of Dynamic Industries Ltd., a domestic corporation of which M.I.C. Limited was the wholly owned subsidiary.")(Exh. 26)

**7.     All of the Key Witnesses "Wear Many Hats"**

None of the transactions and dealings between Defendants occur at arms-length. Mohney, Krontz and St. John all testified that they simultaneously "wear many hats" in running the above-referenced companies and entering into "agreements" between them.  St. John Dep. at 82; Krontz Dep. at 8, 79; Mohney Dep. at 146, 209.   This is perhaps most evident by the "Consulting Agreement" between DVC and Cin-Lan, where Krontz, an officer of both companies, essentially contracts with himself for management services.  Another example is the suggestion that Mohney, the founder and ultimate owner of the entire Déjà Vu enterprise, is merely a salaried "employee" of DVC reporting to Krontz.  As Krontz confirmed, regardless of what hat he was wearing, if he did not follow Mr. Mohney's directives, he stood to be fired. Krontz Dep. at 168. ("I don't think he could set it, but he could fire me at that point.").  Given the numerous hats being worn, it is clear that there are no hard lines between when one is acting in the interest of one company but not another.  As DVC's President's explained:

> A.     It's a great combination, isn't it?  So Mr. Krontz, when he gets this manual as the   president of Cin-Lan, ***it's kind of like he is telling himself he must do something***.

St. John Dep. at 143 (emphasis added) (Exh. 2).  Hence, any claim that every time Mohney, Krontz or St. John *mandated* a policy they were only wearing their Cin-Lan hats, but every time they had their DVC hats on they were merely making "suggestions" or "recommendations" that nobody really had to follow or listen to, is simply not credible.

**D.     Facts In The Record Show That DVC and Mohney Act In The Interest of Déjà Vu Nightclubs, Like Cin-Lan.**

**1.     DVC Provides Far More than Mere Advice: It Has been Delegated the Entire Senior Management Function of Cin-Lan.**

Far from limiting its functions to the provision of occasional recommendations and suggestions as to ways to improve business, as typical business *consultants* do, here nightclubs like Cin-Lan have taken it several steps further and ceded their entire senior management functions to DVC and Mohney.  Because the only officer and director of Cin-Lan is also the Vice-President of DVC, it is clear that Cin-Lan lacks any true independence.  This is further

8

confirmed by the fact Krontz lives in California and when deposed, confirmed that he actually spends very little time actually managing Cin-Lan's business and is paid a fraction of what DVC is to manage Cin-Lan's business.  Instead, Cin-Lan has a general manager (Tom Sime) handle the lower-level management duties, while all senior management duties involving major business decisions and the establishment of business policies are delegated to DVC and Mohney.

DVC establishes policies through which it controls the workplace at all of the Déjà Vu nightclubs in Michigan, including the classification of dancers as independent contractors. Krontz Dep. at 105; Mohney Dep. at 169-70.  DVC manifests control in many ways.  First, as described below, DVC publishes a policy manual outlining the operating procedures for each Deja Vu Nightclub.  Second, DVC has implemented a policy that all Déjà Vu nightclubs have dancers sign standard-form "lease" contracts purporting to waive their FLSA rights, and send copies of the contracts to DVC.  Krontz Dep. at 153-60.  Krontz in his dual capacity as DVC's Vice-President and Cin-Lan's President implements that policy. Id.  As St. John explained, it's really like Krontz's right hand telling his left it *must* do something.  St. John at 143.

Third, when deposed, Joe Hall, a DVC "consultant," confirmed that his job duties involve providing advice to Déjà Vu nightclubs regarding "every aspect of the operation...anything that would be involved in the day to day operational activity of an adult nightclub." Hall Dep. at 21 (Exh. 9).  That duty includes providing advice to clubs like Cin-Lan on dancer classification and FLSA issues. Krontz Dep. at 105; Hall Dep. at 25.

Fourth, DVC recently held a "corporate meeting" in Seattle, attended by its officers, "our partners," employees, and Mr. Mohney where matters related to "the operation of the clubs" and the dancers were discussed. St. John. Dep. at 168-72; DVC Advisory, 9/8/08 (Exh. 24).  Next, under the "Consulting Contract," DVC has free and unfettered access to and control over Cin-Lan's records, contracts and operations.  The Agreement goes so far as to even mandate that Cin-Lan: (1) present certain "Industry Defenses" when involved in litigation like this; (2) indemnify DVC for losses caused by DVC's own misconduct; and (3) purchase insurance for DVC covering DVC's own malfeasance.  Exh. 6 at ¶¶ 3.6, 8, 18.

9

Finally, Harry Mohney circulates policy directives to both DVC and the nightclub general managers addressing "operational issues" at "our businesses" and in particular, issues which relate to the dancers' work and their effect on profitability. See e.g. *Numbers Tell the Story*, at p. 3, 7 Exh. 11 ("Only during emergencies do P.E's [dancers] leave without paying."..."If you find staff that is [sic] underperforming, you need to FIRE them!")

## 2. DVC and Mohney Have The Ability to Hire and Fire Cin-Lan's Workers, Managers and Officers.

DVC and Mohney have the ability to hire, fire and reprimand Cin-Lan's workers, managers and officers.    For instance, when Tom Sime was reprimanded for poor job performance and had his compensation cut, the directive came from DVC and Jim St. John. Sime Dep. at 68-71 ("Jim St. John came in and talked to me about it."), 162 (Exh. 8):

Q.    Well, if DVC wanted to cut your bonus in half, could they do it?
A.    They can.  In fact, they did.

Likewise, when Defendants retaliated against Plaintiff by terminating her after she filed this case, DVC was intimately involved in the decision.  Sime Dep. at 32-33 (confirming that Sime did not make the decision to terminate Plaintiff independently, but instead was told to do so by Joe Hall, a DVC employee)(Exh. 8).[7]  Further, Harry Mohney has written policy directives telling DVC and nightclub general managers to fire certain personnel if certain conduct is not followed or rules are broken. See *Numbers Tell the Story* at p. 3 ("Fire anyone that does not issue a receipt when rent is collected")(Exh. 11); Mohney Dep. at 230 ("I wrote it.").  Finally, Cin-Lan's president confirmed that Harry Mohney can fire him at any time because as the owner of

---

[7]    Similarly, when the general manager of a nightclub in California was fired for violating company policies, the decision to terminate his employment was made by Peter Luster, a DVC "consultant.". Luster Dep. at 12-17, 50-51 (Exh. 12).  Luster provides "all facets of management" for Déjà Vu affiliated nightclubs and ultimately reports to Harry Mohney, "the senior consultant of Déjà Vu Consulting." Luster Dep. at 186.  Despite never being employed by the local nightclub (Pacers, Inc.), DVC and Luster made the initial decision to hire the nightclub's general manager and thereafter supervised and promoted him. Id. at 47-49, 68 (...he reported to both Russell and myself.").  Further, Luster confirmed that he had the authority to re-hire the exotic dancer making the complaint against the nightclub. Luster Dep. at 89 ("..."I asked her if she would like to be reemployed.").

the enterprise he has the ultimate authority.  Krontz. Dep. at 168.  Clearly, Mohney and DVC have control over the workplace.

> **3.    Both DVC and Mohney Are Intimately Involved in the Decisions to Classify Dancers as Independent Contractors.**

As Mr. Mohney's testimony confirms, both he and the officers of DVC have been involved in the decisions to classify exotic dancers working at the Déjà Vu nightclubs as independent contractors, as opposed to employees.  As part of those discussions, Mohney, St. John and Krontz have specifically discussed compliance with the labor codes with relation to the dancer classification issue and made the decision to try to have dancers "elect" to be independent contractors and waive their FLSA rights.  See Mohney Dep. at 167-179:

> Q.    During these discussions that you had with the corporate officers that you mentioned a moment ago, the decision was made to continue classifying the dancers as independent contractors; is that right?
> A.    I don't think that was the discussion the way you stated.  *I think it was more of, you know, how do we comply with the labor codes or how do they comply with the labor codes, how do they comply with the state laws, how could you make the girls employees if you had to*, would the girls become employees, do they want to become employees.
> Q.    Who did you have those discussions with?
> A.    You know, I don't remember any specific sitting down with all that whole conversation with anybody, *but pieces of that may have been made with, you know, Mr. Krontz, Mr. St. John*, various attorneys, friends that own clubs.  You know, *it's a large issue for a lot of club operators.*
>
> * * *
>
> Q.    Mr. Mohney, during our question -- during my questions a moment ago, I heard you saying that to some extent in the past you were involved in discussions over the classification of the dancers issue; is that right?
> A.    *Yes, I've had discussions with people*.

DVC and Mohney then apply that decision at the Déjà Vu nightclubs. Krontz Dep. at 105:

> Q.    Does Déjà Vu Consulting provide advice and consulting on classification issues to its affiliated companies?
> A.    I believe it has, yes.

Hence, facts show that the very employment policies challenged in this action were established and perpetuated by Mohney and DVC's officers.

**4.     DVC and Mohney Publish a Manual Explaining The Operating Procedures That Apply to Club Management and Exotic Dancers.**

DVC and Mohney have prepared a detailed Manual describing the standard operating procedures for Déjà Vu nightclubs like Cin-Lan.  St. John at 138, 141, 147; Mohney Dep. at 243-44 ("I think I had some lines I probably wrote.").  Included in the Manual are, *inter alia*, detailed chapters addressing "General Employment Policies," "Management Personnel Responsibilities" and "Entertainers." (Exh. 13, 14)  Included within the 19-page chapter explaining workplace policies applicable to "Entertainers," are specific sections addressing: the classification of dancers as independent contractors; policy directives regarding use of the "lease;" penalties and fines for missing or being late for a work shift; "tenancy rules for entertainers," and immediate "termination" for claiming the work relationship to be anything "other than a landlord and a tenant."  (Exh. 14)  Again, these are the very workplace policies challenged in this lawsuit.

**5.     Mohney Monitors and Scrutinizes the Work of the Exotic Dancers.**

As part of his regular work duties, Mohney monitors and scrutinizes the job performance of exotic dancers working at the nightclubs.  Mohney Dep. at 18-20.  For example, Mohney either personally or through agents conducts "secret shopper" visits to the Déjà Vu nightclubs to monitor activities inside the club, including dancer conduct.[8] If a dancer violates a policy, Mohney notes it on a report provided to both DVC and the nightclub general manager.  See e.g. Exh. 14 ("Joe Hall, Tom Simms:  Need Some Change"); Mohney Dep. at 219-227.  As Mohney testified, his purpose in doing this is twofold.  One, he does it to "find out if they [the dancers] are following the laws, whether they are doing illegal dances, or you know, ripping off the customers."  But additionally, Mohney's does it because he is the actual owner of the business and is managing the asset from which he ultimately stands to receive all of the profits. Mohney

---

[8]   Mohney and other DVC personnel also have the ability to monitor the ongoing activities at each Déjà Vu nightclub via a closed-circuit camera system linked to their computers. Mohney Dep. at 226-29; Krontz Dep. at 111, 116-18.

Dep. at 223, 229 ("Yes, as a shareholder of Imagination, I would also be concerned about the profitability of the club.").[9]

### 6.   Mohney Scrutinizes Financial Reports Of The Nightclubs. Addressing The Dancer's Financial Performance.

Similarly, Mohney reviews and scrutinizes the weekly financial reports showing the "rent" income that the nightclubs derive from the dancers.  Mohney Dep. at 138-39, 145-55. When the dancer "rent" or "average dance per customer" figures are considered substandard, Mohney writes notes questioning or scolding the nightclub's general manager.  See e.g. Financial Reports (Exh. 18) ("To Tom Sime; From: Harry Mohney:  Tom Simms: What's going on, you have a big downturn"); ("Tom Simms: This Sucks!  H.").  Knowing that Mohney is the "top man" and owner of the company, not merely an unrelated, third-party "consultant," club managers like Tom Sime promptly respond with a certain degree of fear.  See e.g. Financial Reports (Exh 18) ("Harry: I don't know what's wrong.  But I'm living here until its fixed! Tom."); ("Attn club managers: S**t rolls down hill."); ("Harry...I'd like to tell you its about gas and food, but I know you don't want to hear that.") Sime Dep. at 193-94, 199.  Again, Mohney admittedly wears "a couple different hats" when he conducts these functions.  Mohney Dep. at 209-212. One, he is acting as a manager by communicating information about substandard employee performance to the nightclub's general manager, but additionally, as the business owner, he's trying to maximize the profits that will flow to him.  Id.  The later function is evidenced by the fact that in providing these reports to Sime, Mohney offers no suggestions, guidance or insight to Sime as to how to increase business or solve problems, as a consultant might be expected to do.  Sime Dep. at 189.  Instead, Mohney simply demands change and his

---

[9]   The perception of dancers working in the nightclubs is that Mohney is the owner of the Déjà Vu nightclubs.  See generally Plaintiff Jane Doe's Dep. at 84-85 (Exh. 17).
Q.      And who would you have gone to above Tom [Sime's] head?
A.      Well the only other person I knew was Harry [Mohney].
Q.      How did you know Harry?
A.      I just assumed that he was the owner from what I've heard.
Q.      Okay. And who did you hear that from?
A.      People in the club.  Girls.

message is understood by Sime to be that of the owner, not merely that of a disinterested employee of a third-party vendor of consulting services.  Sime at 192, 199 ("He, in the past, doesn't want to hear many excuses.")

### 7.    Mohney Scrutinizes the Physical Facilities of The Nightclubs Where the Dancers Work and Determines Necessary Changes

Mohney also physically inspects nightclubs where the dancers work and determines changes to the physical structure that that should be made to enhance the workplace, to "improve sales," and "to make our selves [sic] a success." <u>See</u> Report (Exh. 10); Mohney Dep. at 211-14. For example, Mohney inspected the two nightclubs in Kalamazoo and wrote the following in his report to the nightclub's general managers:

> 5) At least one of the large poles and the bar pole needs to be changed to our standard size.  This is necessary because two girls have already felt and hurt themselves because of their inability to grip the large poles and you only have 3-5 girls that now can do poles tricks on the large poles.  Chris Corwin will take care of this as soon as possible.
> 6) All wait staff while will be given French Maid uniforms to wear.  The club will give each wait person two free ones every six months, and any extras they need you can sell them at cost.
> * * *
> 9) We need to put some stage light on the bar stage.  Call Chris Corwin.
> * * *
> Ladies as we discussed your clubs are only as good as your leadership and the weakest link in our team of employees, if you fail to work together you will fail all together.  ***Then someone will make changes***.

Exh. 10.  <u>See also</u> Report (Exh. 19).  The changes to the nightclub's structure that Mohney determines need to be made are then contracted to International Amusement, Ltd., a company Mohney owns and controls through Imagination. (Corwin works for International Amusements. Mohney Dep. at 212-215).  As this example confirms, the changes identified by Mohney are not mere "suggestions" made by a disinterested "consultant."  Rather they are directives from the top man of the enterprise, accompanied by a direct threat of being fired if not complied with.

### III.    APPLICABLE STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of any genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence

14

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986); Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir.2003).  Only when the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," is there no genuine issue of material fact. Matsushita Elec. Ind. v. Zenith Radio, 475 U.S. 574, 587 (1986).

Here, Defendants DVC and Mohney simply cannot meet their burden.  Numerous facts in the record show that both Mohney and DVC are joint employers of Plaintiff and the other dancers in the Class.  Thus, if summary judgment is granted to any party, it can only be Plaintiff.

## IV.  ARGUMENT

### A.   DEFENDANTS' INITIAL ARGUMENTS ARE MISPLACED BECUASE THEY DO NOT ADDRESS THE JOINT EMPOLOYER ISSUE BEFORE THE COURT.

#### 1.   Plaintiff Need Not Pierce the Corporate Veil or Prove That Cin-Lan is Insolvent In Order to Proceed Against DVC and Mohney.

DVC and Mohney mistakenly argue throughout their motion that they should be dismissed simply because Cin-Lan alone is a "proper and adequate Defendant."  In making this argument, Defendants imply that before they can be found liable under the FLSA and MWL, Plaintiff must first pierce the corporate veil as to Cin-Lan or prove that Cin-Lan is insolvent. This suggestion is completely off-base as it ignores the simple fact that under the joint employer doctrine two or more completely separate, valid, and operational corporations can, and regularly are, held jointly and severally liable under FLSA and the MWL.  Falk v. Brennan, 414 U.S. 190, 195 (1973).  In fact, "Congress has expressly disregarded the corporate shield with respect to the analysis of coverage under the FLSA." Patel v. Wargo, 803 F.2d 632, 636 (11th Cir., 1986).  As the Court in Donovan v. Agnew, 712 F.2d at 1513-14 explained in rejecting similar arguments:

> But neither does the language of the Act in defining employer support appellants' contention that officers in a bona fide corporation can never be held personally liable for unpaid wages. Looking beyond that single section, it is clear that Congress did not intend to incorporate the common law parameters of the employer-employee relationship.

712 F.2d at 1513-14.

Therefore, Plaintiff need not pierce the corporate veil or prove that Cin-Lan is insolvent to establish that DVC or Mohney are liable as joint employers.  Rather, as described below, joint employer status under the wage and hour laws involves an entirely different and far more liberal test that has nothing to do with the matters Defendants argue at pages 11-13 of their brief.

      **2.**    **Defendants' "Enterprise Liability" Argument Is Misplaced.**

Next, Defendants erroneously contend that Plaintiff claims that Defendants are liable under the FLSA strictly on an "enterprise theory."  Def. Brief at 5-11.  Here, Defendants misinterpret Plaintiff's Complaint.  Plaintiff does not contend that DVC and Mohney are liable to her and the Class simply because they are part of an "enterprise," as that term is defined in as defined in 29 U.S.C. §203(r) and §203(s).  Rather, as described below, Plaintiff contends that DVC and Mohney are liable because they are "joint employers" under the FLSA and MWL.  Besides establishing that the threshold level of gross revenues for FLSA coverage is met, facts establishing the existence of an enterprise under 29 U.S.C. §203(r)(1) remain relevant towards establishing joint employer status since by definition the existence of an "enterprise" establishes "common control" "for a common business purpose."

      **3.**    **Plaintiff Does Not Lack Standing to Sue DVC or Mohney**

At pages 22-23 of its brief, DVC and Mohney claim that Plaintiff lacks standing to assert any claims against them.  This argument is nothing but a rehash of Defendants' other arguments refuted below, and therefore need not be separately addressed.

**B.**    **DEFENDANTS READ THE APPLICABLE LEGAL STANDARD FOR JOINT EMPLOYER STATUS TOO NARROWLY.**

      **1.**    **Both The FLSA and MWL Contemplate There Being Several Simultaneous "Joint Employers" Of A Worker.**

The FLSA's definition of the term employer is the broadest . . . that has ever been included in any one act, U.S. v. Rosenwasser, 323 U.S. 360, 363, n. 3  (1945).  The FLSA "expansively" defines "employer" to include "any person acting directly *or indirectly* in the interest of an employer in relation to an employee...." 29 U.S.C. § 203(d); Falk v. Brennan, 414 U.S. 190, 195 (1973); see also 29 C.F.R. § 791.2.  "The remedial purposes of the FLSA require

16

the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." Dole v. Elliott Travel, 942 F.2d 962, 965 (6th Cir. 1991). "Congress has expressly disregarded the corporate shield with respect to analysis of coverage under the FLSA." Patel, supra.   In turn, "the FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." Elliott Travel, citing Falk, supra. Dep't of Labor v. Cole Enterprises, Inc., 62 F.3d 775, 778 (6th Cir. 1995) ("More than one employer can be responsible for FLSA obligations."). Each is known as a "joint employer."

In deciding whether a party is a joint employer, "economic reality" controls rather than labels, contracts or common law concepts of agency.  Goldberg v. Whitaker House, 366 U.S. 28, 33 (1961).  Under this test joint employer status is found where: (1) the person or entity has operational control over the enterprise which the nominal employer is part of, or (2) the person has "substantial control of the terms and conditions of the work of [the] employee." Falk, 414 U.S. at 195; Elliott Travel, 942 F.2d at 965.  As Department of Labor regulations explain:

> (b)    Where the employee performs work which simultaneously benefits two or more employers, ... a joint employment relationship generally will be considered to exist in situations such as:
> * * *
> (3)    Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, *by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.*

29 C.F.R. § 791.2(a) and (b) (emphasis added).

To determine whether a 'joint employer' relationship exists under the 'economic realities' test, courts generally consider whether the alleged employer: (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment

records.[10] Neither factor is conclusive and not all factors need be satisfied.  Rather, as with the economic realities test for "employee" status, the test for "employer" status is a balancing test. In turn, applying this expansive test, Courts have not hesitated to find shareholders, partners, officers, managing agents, "management companies," and "consultants" to be "joint employers."

### a.    Corporate Officers Are Typically Joint Employers.

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Elliott Travel, 942 F.2d at 965, quoting, Donovan v. Agnew, 712 F.2d 1509 (1st Cir. 1983).  Therefore, any person or entity with managerial responsibility and substantial control of the terms and conditions of the workplace constitutes an "employer" under the broad statutory definition in FLSA.  Elliott Travel, supra; Cole Enterprises, 62 F.3d at 778.  This holds true even if the person lacks a direct ownership interest in the corporation, Donovan v. Sabine Irrigation Co., 695 F.2d 190, 194-95 (5th Cir. 1983); or has minimal ownership interest, Usery v. Weiner Bros., Inc., 70 F.R.D. 615, 617 (D.Conn.1976).  Reich v. Circle C Investments, Inc., 998 F.2d 324, 329 (5th Cir.1993) ("FLSA's definition of employer is sufficiently broad to encompass an individual who, though lacking a possessory interest in the employer corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees.").

### b.    Management Companies and Consultants Are Joint Employers.

Courts have found that management companies and "consultants" are joint employers when they have substantial control of the terms and conditions of the workplace.  This was confirmed by the Supreme Court in Falk, where it held that a real estate management company, which rendered management services for owners of apartment complexes, and had substantial

---

[10]    See generally Finke v. Kirtland Cmty Coll. Bd. of Tr., 359 F.Supp.2d 593, 599 (E.D. Mich.2005); Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir., 2003); Tullous v. Texas Aquaculture Processing Co., 579 F.Supp.2d 811, 820 (S.D.Tex. 2008); McDonald v. JP Marketing Assoc., 2007 WL 1114159 (D.Minn.,2007)(Exh. 20); Mantei v. Michigan Public School Emp., 663 N.W.2d 486, 495 (Mich. 2003).

control over the terms and conditions of the workplace, was a joint employer of the employees working at the apartments, along with the apartment owners. 414 U.S. at 193-94.  See <u>Usery v. Godwin Hardware</u>, 426 F.Supp. 1243 (W.D. Mich. 1976)(managing agent who actively participates in the management of a business regarding the employment practices prevailing in the business is an employer under FLSA); <u>Circle C Investments</u>, 998 F.2d at 329 (business "consultant" was a joint employer); <u>Donovan v. Tavern Talent and Placements, Inc.</u>, 1986 WL 32746 at *3 (D. Colo. 1986)(management company was joint employer)(Exh. 21)

> **c.    The "Top Man" and Primary Shareholder of a Closely-Held Family of Companies is A Joint Employer.**

Courts also hold that the "top man" who stands at the apex of a family of closely-held companies, who finances those companies, and/or who stands to profit from those companies, is a joint employer of the workers of the companies even if he/she cedes day-to-day management duties to key employees or subsidiaries.  For instance, in <u>Donovan v. Grim Hotel Co.</u>, 747 F.2d 966, 970 (5th Cir. 1984), the Fifth Circuit held that the founder/president of a company that managed and oversaw the operations of five separate hotel corporations, was jointly an "employer" of the workers at each of the five hotels under FLSA.  As the Court explained, despite the creation of separate corporations, if the apex person still plays a prominent role in the operation and management of the businesses, guides their policies, and/or stands to profit from their operation they will be considered a joint employer for purposes of the wage and hour laws:

> Here, to reiterate, the district court found the realities to be: Alberding began and controlled the hotel corporations. He has held their purse-strings and guided their policies. It was only he who could authorize compliance with the Fair Labor Standards Act.  He personally selected the manager of every hotel. He travelled to Texas to inspect the hotels and to solve major problems. ***The hotels were part of the Alberding family business. In short, the hotels, speaking pragmatically, were Alberding's and functioned for the profit of his family.*** Like the individual statutory employers in <u>Mack Farland</u> and <u>Janitorial Services</u>, *supra*, ***Alberding was the "top man."***

<u>Grim Hotel</u>, 747 F2d at 971-972 (emphasis added). See also <u>Elliott Travel</u>, 942 F.2d at 965-66 (citing <u>Grim Hotel</u> with approval); <u>Cole Enterprises</u>, <u>supra</u>.

This was further confirmed in <u>Donovan v. Janitorial Services, Inc.</u> 672 F.2d 528, 530-31 (5th Cir. 1982) where the Court held that the principal of a group of companies was the joint employer of the workers of those companies because as a practical matter, his significant investment and position as the majority owner of the enterprise gave him ultimate authority over its affairs.  As the Court explained:

> Common control, as that term was interpreted by <u>Mack Farland</u>, vests in Meis. ***Though day-to-day management of Johnson Disposal is in the hands of its president, Gary Johnson, Meis' considerable investment in the company gives him ultimate, if latent, authority over its affairs.*** That Meis has exercised that authority only occasionally, through firing one employee, reprimanding others, and engaging in some direct supervision of Johnson Disposal drivers, does not diminish the significance of its existence.
>
> The considerations supporting a determination that the three corporations compose a single enterprise also support a conclusion that Meis is an employer of the Johnson Disposal employees, within the meaning of FLSA s 3(d).

<u>Janitorial Services</u>, 672 F.2d at 530-31 (emphasis added).

Thus, the mere fact certain supervisory functions are delegated to lower level managers does not alter the fact that corporate officers and company owners with the ultimate power to set employment conditions and control the manner in which the lower level managers discharge any of the supervisory functions delegated, are "joint employers." <u>Mendez v. Brady</u>, 618 F.Supp. 579, 582-83 (W.D. Mich. 1985).

In turn, under circumstances strikingly similar to those presented in the case at Bar, courts have found both owners and outside management "consultants" of exotic dance nightclubs to be "joint employers" of dancers. <u>Reich v. Priba Corp.,</u> 890 F.Supp. 586, 590-91 (N.D.Tex. 1995) (owner of an exotic dance nightclub who although not directly responsible for the day-to-day operation of the club, was involved in major policy decisions that would affect the profitability of the nightclub was a joint employer liable to dancers for FLSA violations); <u>Circle C Investments</u>, 998 F.2d at 329 (5th Cir.1993)("consultant" of exotic dance nightclub found to be an "employer" under FLSA); <u>Tavern Talent and Placements</u>, 1986 WL 32746 at *3 (finding both separate company [IEC], which outsourced managers to adult nightclubs, and its principal,

to be the joint employers of exotic dancers who were hired and outsourced to the nightclubs by another company [Tavern Talents].)

2. **The Standard For Joint Employer Status Under The MWL Is The Same.**

The standard for joint employer status under the MWL is the same as the FLSA.  The MWL at M.C.L. §408.382(c) uses near identical terminology in defining the term "employer" to mean "a person, firm, or corporation, ….and *a person acting in the interest of the employer*, who employs 2 or more employees at any 1 time within a calendar year."  In turn, the Court in Sims v. Parke Davis, 334 F.Supp. 774 (E.D. Mich. 1971) confirmed that the test for "employer" status under the MWL is the same as under the FLSA and the Michigan Workmen's Compensation Act.  Id. at 789.   As the Michigan Supreme Court explained in Kidder v. Miller Davis Co., 564 N.W.2d 872 (Mich. 1997):

> The relationship must still be evaluated under the economic reality test, which in this case yields the same conclusion: Both Miller-Davis and CLS must be considered dual or co-employers for purposes of the exclusive remedy provision of the worker's compensation statute. Again, this standard examines a number of criteria including control, payment of wages, hiring, firing, the maintenance of discipline, and common objective. These factors are viewed together in their entirety under a totality of the circumstances test. We repeat: No one factor is controlling.

Id. at 880.  Therefore, both the FLSA and the MWL employ similar standards.

3. **Where Facts Show That Joint Employers' Act In Each Others' Interests And Simultaneously Control The Workplace, The Economic Realities Establish The Misclassification Of Workers By All**.

In each of the above-referenced scenerios, joint employer status is found because the economic realities of the situation establish that the corporate officers, consulting or management company, or "top man" of a family of related companies have sufficient control and authority over the affairs of the nominal employer to make them "joint employers." In turn, when courts apply the distinct six-point economic reality test for "*employee*" status set forth in Donovan v.

Brandel, 736 F.2d 114, 1116-19 (6th Cir., 1984), those factors apply equally to all joint employers because control and authority over the employee's workplace is sufficiently shared.[11]

Here, the Court has already found that Plaintiff is likely to succeed on her claim against Defendants that she was misclassified as an independent contractor.  Order Denying Motion for TRO, Nov. 22, 2008 at 36-37.  Therefore, at the very least, there are disputed facts on the issue of employee classification based on the evidence already in the record.  Contrary to Defendants' assumption, there is no need to repeat all of the evidence presented in the TRO motion with regard to the Brandel factors again here.  Plaintiff's nor any other dancer's level of dance skill, business management skill, investment or permanency of employment did not change from one joint employer to the other.  The only issue that needs to be examined in this motion is the factors addressing DVC's and Mohney's control and authority over the workplace.

## C.     FACTS ESTABLISH THAT DVC IS A JOINT EMPLOYER.

### 1.     The Skeletal Facts Which Defendants Present in Their Supporting Declarations Are Misleading.

Review of the Declarations of Jim St. John and Harry Mohney filed with Defendants' motion for summary judgment show that they are incomplete and misleading.  Discovery has confirmed that their statements do not come even remotely close to describing the actual roles that DVC and Mohney play in operating and controlling the activities of Déjà Vu nightclubs, like Cin-Lan, where Plaintiff worked.  As the demonstrated above, both DVC and Mr. Mohney have far more extensive roles in controlling, monitoring and operating the Déjà Vu nightclubs where the dancer's work than their declarations would ever lead one to believe.  For example, in paragraph 22 of his declaration, Mr. St. John attests "[DVC] plays no part in the day-to-day

---

[11]   It is important to note that there are actually two "economic reality" tests at issue in this case.  See cases cited in footnote 10, infra. This motion addresses the "economic reality" test for "employer" status to determine if all three Defendants fall within the definition of "employer" in 29 U.S.C. §203(d) and M.C.L. §408.382(c).   In contrast, the previous TRO motion addressed the "economic reality" test for "employee" status applying the six Brandel factors to determine if Plaintiff and other dancers working at the nightclubs fall within the definition of "employee" in 29 U.S.C. §203(e) and M.C.L. §408.382(b).

operation of Cin-Lan."  In contrast, when deposed, St. John's "right hand man" at DVC, Joe Hall, conceded the exact opposite:

> "I provide, based on my knowledge and experience, advice and consulting recommendations based on every aspect of the operation from cost controls to promotions, to pricing recommendations.  I mean anything that would be involved in the day-to-day operational activity of an adult nightclub."

Hall Dep. at 21 (Exh. 9).

Likewise, Mr. Mohney attempts to create the illusion in his Declaration that he has nothing to do with either Cin-Lan or DVC other than to make occasional suggestion on a zoning issue or design of a Déjà Vu logo or trademark.  What he conveniently fails to mention is that he owns 100% of the company that owns 100% of Cin-Lan.  Mr. Mohney also omits any mention of the fact he has been responsible for creating and perpetuating the very classification policy challenged in this case.  Finally for Mr. Mohney to claim that he has absolutely no involvement with Cin-Lan's business operations, while at the same time admitting that he regularly analyzes Cin-Lan's financial reports and scrutinizes the "rent" revenue generated by the dancers because, as we now know, he receives the profits, is simply not credible.

2. **Facts Confirm That DVC Has Substantial Control Over the Terms and Conditions of the Dancer's Workplace.**

As shown above, under applicable Supreme Court and Sixth Circuit precedent, joint employer status is found where: (1) an entity has operational control over the enterprise which the nominal employer is part of, or (2) the person has "substantial control of the terms and conditions of the work of [the] employee." Falk, 414 U.S. at 195; Elliott Travel, 942 F.2d at 965. Applying this standard to the facts in the record confirm that DVC is a joint employer of the dancers as it has control over the workplace and conditions of employment.

a. **DVC exercises control over the workplace and conditions of employment.**

Facts in the record confirm that DVC exercises control and authority over the dancer's workplace.  Among other things, DVC provides senior management functions for Cin-Lan, shares its officers with Cin-Lan and is paid more than 2000% for management consulting

23

services than Cin-Lan pays its own officer/director.  As pertains to workplace rules and policies, DVC and Mohney publish a manual addressing dancer conduct and provide it to all Déjà Vu nightclubs like Cin-Lan.  While DVC attempts to claim that the policies in the manual are merely suggestive, DVC's President made clear that Cin-Lan really "must" follow it. St. John Dep. at 143.  The manual itself uses mandatory language.  See e.g. Exh. 14 at p. 56 ("Each entertainer is required to read and sign a Dancer Performance Lease prior to performing.").  That Cin-Lan actually follows the policies in the DVC manual is evident from the fact that in practice, Cin-Lan routinely conducts its business in accordance with those policies.  See Krontz Dep. at 107.  For instance, when DVC demanded that the individual nightclubs like Cin-Lan send copies of the dancer's "lease" contracts to DVC, Cin-Lan complied.  Krontz. Dep. at 153-55.  Similarly, in accordance with the manual, Cin-Lan has never classified any dancer as an employee before. Finally, control over the workplace is shown by the Consulting Agreement that DVC enters into with nightclubs like Cin-Lan.  Those contracts mandates the nightclub maximize its gross income and net profits, and provide DVC unfettered access to every aspect of the nightclub's operations.  Id. at ¶¶ 3.1, 3.3, 3.4.

**b.**  **DVC has the ability to hire and fire workers.**

This factor is amply satisfied.  Cin-Lan's own President testified that Mohney, a DVC employee, had the ultimate power to fire him.  With regard to other Cin-Lan employees such as the club's general manager and Plaintiff herself, DVC was intimately involved in disciplining and/or terminating them.  Finally, DVC's mandates use of a "lease" contract that calls for dancers to be immediately terminated if they attempt to exercise their FLSA rights and claim the relationship to be anything but that of a "landlord and tenant."

**c.**  **DVC is involved in determining the rate and method of payment.**

This factor is satisfied as well.  Facts show that DVC has been involved in the critical decisions as to whether to continue to classify exotic dancers working at the nightclubs as independent contractors.  DVC was also involved in creating the "lease." Additionally, DVC and Mohney specifically discussed dancer's rate and method of pay at DVC's recent corporate

meeting. DVC Advisory (Exh. 24).  From this it is evident that DVC has always been involved in the determining the rate and method of pay: no wages but instead, the dancer must pay the nightclub "rent."

        **d.**        **DVC maintains and/or has access to dancers' employment records.**

This factor is also satisfied.  DVC requires that all Déjà Vu nightclubs send it copies of the dancer's contracts.  Krontz. Dep. at 153-55.  The DVC manual contains a specific chapter on "Club Paperwork, Bookkeeping and Payroll."  (Exh. 15) Applying these policies, detailed "daily reports" showing dancers' "rent" are required to be promptly provided to the "Déjà Vu Corporate Office" and the club's "bookkeeper." Id.  Finally, other data regarding the dancer's employment are maintained on the Aloha computer system, which DVC has access to.  St. John Dep. at 187.

Clearly, the foregoing facts demonstrate that the economic reality of the situation is that DVC has "substantial control of the terms and conditions of the work of [the] employee."  Joint employer status has been found in similar situations. In Falk, the Supreme Court found that a management company which provided similar services to a number of separate companies that owned apartment buildings was a joint employer.  The Court found that even though the building owners provided "nominal supervision," the fact that management functions were provided by the defendant company was sufficient to make it a "joint employer."  414 U.S. at 192-93.

In fact in situations strikingly similar to that presented in this case, Courts have found that "consultants" to exotic dance nightclubs are "joint employers" of the dancers.   In Circle C Investments, 998 F.2d at 329, the Fifth Circuit held that a "consultant" that contracted to provide "consulting" services to an adult nightclub was a joint employer despite the fact that: (1) he claimed to have no direct ownership interest in the nightclub; (2) the parties' consulting contract purported to specifically exclude "personnel matters" from the scope of the consultant's responsibilities, and; (3) the consultant disclaimed any responsibility for day-to-day functions at the nightclub.   Similarly, in Tavern Talent, 1996 WL 32746, the District of Colorado found that a distinct company, IEC, which leased managers to an adult nightclub, as well as IEC's manager,

were both joint employers of the exotic dancers working at the nightclub, despite having no direct employment contract with the dancers.  As the Court explained:

> IEC manages, set hours and generally oversees the daily activities of the entertainers. If an entertainer acts in a manner which could jeopardize the liquor license of a club, then IEC may require that employee to leave the nightclub. The entertainers perform work which simultaneously benefits both IEC and Tavern Talent. They are subject to the direction and control of both entities. Therefore, both entities are responsible for the activities of the entertainers and are jointly and severally liable for any violations of the Act.
>
> It is also clear from the facts that Harold Lowrie and John Titello each act directly in the interest of Tavern Talent and IEC, respectively, in relation to the employees or joint employees of each entity, and are therefore employers within the meaning of the Act.

Tavern Talent, supra at *3.

Certainly the relationship between DVC and the exotic dancers in this case is no more remote that the relationships between the dancers and the persons/entities found to be joint employers in Falk, Circle C and Tavern Talent.  As a result, the Court should deny Defendants' motion for summary judgment.  The facts definitively prove that DVC is a joint employer.

**D.      FACTS ESTABLISH THAT HARRY MOHNEY IS A JOINT  EMPLOYER.**

In determining FLSA coverage Courts "look beyond formalistic corporate separation to the actual or pragmatic operation and control, whether unified or, instead, separate as to each unit." Grim Hotel, 747 F.2d at 970.  In turn, Courts hold that the FLSA's definition of employer is sufficiently broad to encompass an individual who, even if lacking a possessory interest in the employer corporation, effectively dominates its administration, otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees. Circle C, 998 F.2d at 329.  Facts in the record clearly establish that Harry Mohney is a joint employer of the dancers working at the nightclub as he exercises significant control over the workplace, and as the founder and owner of the enterprise, has ultimate authority over its operations.

**1.      Mohney has control over the workplace and conditions of employment.**

Facts show that Mohney is the "top man" of a closely-held family of companies with ultimate authority over the operations at Cin-Lan and the other Déjà Vu nightclubs.  Mohney

owns Cin-Lan and other nightclubs through Imagination.   Mohney holds a similar position of

authority over DVC and the other entities in the enterprise held by the Durand Trust.   Mohney

simply transferred his interest in these the companies to his family trust for legal reasons.   In this

regard, it is not insignificant that numerous courts have found that despite Mohney's efforts to

masquerade his ownership interests in Déjà Vu companies and portray himself a mere

"consultant," he still exercises the highest level of authority over all the companies.   Mohney

Dep. at 51-52 (testifying that he plead guilty to Count 1 and was convicted on the remaining

count of the indictment appended to U.S. v. Mohney, 723 F.Supp. 1197, 1204 (E.D.Mich.1989),

rev'd 949 F.2d 899 (6th Cir. 1991) (describing how Mohney concealed his true ownership and

control of numerous adult businesses, including Cin-Lan, by transferring record ownership to his

nominees but continuing to "directly manage" them "under the ruse of an independent

consultant.").   As the Court found in Déjà Vu Inc. v. Commissioner, 1996 WL 270943 at *1-2

(U.S. Tax Ct.) (Exh. 22):

> At all times relevant herein, petitioner was a member of an organization of over
> 50 businesses that were engaged in the adult entertainment industry. All of these
> businesses were wholly or partially owned by Harry V. Mohney (Mr. Mohney)
> either or indirectly through various trusts.....Petitioner also provided
> operational, management, and consulting services to adult entertainment clubs
> doing business as Déjà Vu.   Donald Krontz (Mr. Krontz), who served as
> petitioner's president during the subject years, made all of petitioner's executive
> decisions in consultation with Mr. Mohney.[12]

That Mohney still exercises his authority to direct activities at the nightclubs related to

the dancer's work is perhaps best demonstrated by that fact that he receives weekly sales reports

reporting dancer "rent" revenue, heavily scrutinizes those reports, and reports his findings to the

nightclub managers.   See Exh. 18 "Harry: I don't know what's wrong.   But I'm living here until

it's fixed! Tom."   That Mohney exercises control over the workplace is also demonstrated by his

---

[12]   See Eyefull Inc. v. Commissioner, 1996 WL 270936 (U.S. Tax Ct. 1996) ("Mohney's consulting
relationship with petitioner conformed to the general pattern. From the founding of the company through
the taxable years at issue, Mohney exercised the highest executive responsibilities and actively
participated in making and implementing major corporate decisions....")(Exh. 23); Klien, 19 F.3d 20
("Also, both domestic and foreign corporations were used to conceal Mohney's interests and the true
ownership of the corporations was further obfuscated by the filing of false or incomplete tax returns.")

personal inspections of the clubs to ensure that the dancers are "following the laws, whether they are doing illegal dances, or you know, ripping off the customers." Mohney Dep. at 225-27.

### 2.      Mohney has the ability to hire and fire workers

As demonstrated above, Mohney has the power and ability to fire employees, including Cin-Lan's President.  Mohney has also circulated directives instructing DVC and the nightclub general manager informing them to fire personnel who do not follow certain directives.   Finally, Mohney has endorsed use of the "lease" contract which calls for dancers to be terminated should they assert their FLSA rights by claiming to be employees.

### 3.      Mohney determines of the rate and method of pay.

As shown above, since his acquisition of the first Déjà Vu nightclub, Mohney has been intimately involved in the decision whether to pay dancers any wages at all.

### 4.      Mohney has access to dancer employment records.

In his numerous positions controlling the companies in the enterprise, including DVC and Modern, Mohney has had access to the employment records of the dancers and has been involved in the decision to maintain records at Modern.

The foregoing facts establish that Mohney is a joint employer of dancers like Plaintiff. Courts have repeatedly found the "top men" heading families of closely-held companies to be joint employers under the FLSA.  The mere facts that certain functions may be delegated to lower-level managers, like Tom Sime, does not alter this conclusion. Mendez, supra.   For instance, in Elliott Travel, 942 F.2d 962, the Sixth Circuit held that a corporation's president/co-owner was an "employer" within meaning of FLSA, even though other employees handled many day-to-day problems associated with operation of corporation.   As the Court explained:

> Schubiner was the chief corporate officer, had a significant ownership interest in the corporation, and had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries. ... ***To be classified as an employer, it is not required that a party have exclusive control of a corporation's day-to-day functions. The party need only have   operational control of significant aspects of the corporation's day to day functions.*** *Id.* (emphasis added). In short, the evidence clearly demonstrates that Schubiner was the top man  at Elliott Travel, and the corporation functioned for his profit.

942 F.2d at 966 (emphasis added).

Similarly, in Cole Enterprises, 62 F.3d 775, the Sixth Circuit held that a company's president, who owned 50% of the company and was involved in making decisions about employment terms, had sufficient operational control over a corporate-owned restaurant to make him a joint employer under the FLSA.  As the Court reasoned:

> One who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an employer  for the purposes of FLSA.

62 F. 3d at 778.

Relying on Dole v. Elliott Travel, the Sixth Circuit in Fegley v. Higgins, 19 F.3d 1126, 1131 (6th Cir.), cert denied, 513 U.S. 875 (1994) determined that the chief executive officer of corporation and his business partners, were all jointly liable with corporation under FLSA for unpaid wages where the CEO had significant ownership interest in corporation and controlled significant functions of business.[13]  Likewise, in Finke v. Kirtland Cmty Coll. Bd. of Tr., 359 F.Supp.2d 593, 599 (E.D. Mich.2005) the court held that a professor, serving as the *de facto* president of a community college during the actual president's absence, exercised substantial control over the terms and conditions of an employee's work and therefore, was a joint employer under the FLSA.  Finally, in Usery v. Godwin Hardware, 426 F.Supp. 1243, 1266 (W.D. Mich. 1976) the district court held that an individual defendant, who owned 100% of stock of hardware company and 40% of stock of plumbing company, was the joint employer of the employees working at both companies, as he actively participated in the management of the businesses.

Case law also confirms that the "top man" at exotic dance clubs are "joint employers." For instance, in Reich v. Priba, 890 F.Supp. at 590, the Court held that "although not directly

---

[13]     The Sixth Circuit's decisions are in accord with those of Circuits. See e.g. Grim Hotel, 747 F.2d at 971-72, Janitorial Services, 672 F.2d at 530-31; Donovan v. Agnew, 712 F.2d at 1511; Chambers Const. Co. v. Mitchell, 233 F.2d 717, 724 (8th Cir. 1957); U.S. v. Stanley, 416 F.2d 317 (2d Cir. 1969).

responsible for the day-to-day-operations of the club," the owner of the two companies which operated the nightclub was a joint employer of the exotic dancers working there.

> Izzedin was the driving force behind [Cabaret Royale]. Izzedin pioneered the concept of an upscale gentlemen's club in Dallas, and his club sets the standard for similarly situated establishments. His involvement in developing Cabaret Royale and his subsequent efforts to develop such establishments in other markets, clearly demonstrate that Izzedin occupies the status of an employer within the meaning of § 3(d) of the FLSA.

890 F.Supp. at 590 (internal citations omitted).

Similarly, in <u>Reich v. Circle C</u>, 998 F.2d at 329 the Fifth Circuit found that the husband of the nightclubs' owner working as a "consultant", exercised sufficient control to be considered a joint employer, along with the corporation as he was "the driving force" behind the club.

Based on the facts presented here, the Court cannot come to any different conclusion with respect to Mr. Mohney. Mohney is clearly the "driving force" behind Cin-Lan and the entire Déjà Vu enterprise, responsible for major policy decisions, and ultimately receiving all the profits of the businesses (or directing them to his children). Therefore, he is properly considered a "joint employer" of dancers working at the nightclubs.

## V.   CONCLUSION

The facts in the record clearly show that both DVC and Mohney satisfy the test to be considered joint employers under both the FLSA and MWL as they have significant control and authority over the dancers' workplace. As a result, Defendants' motion should be denied. If any party is granted summary judgment on this issue, it should only be Plaintiff.

Respectfully submitted,

Dated:  July 24, 2009        By:    s/ Hart L. Robinovitch
                                     Hart L. Robinovitch, AZ Bar No. 020910
                                     ZIMMERMAN REED, P.L.L.P.
                                     14646 N. Kierland Blvd., Suite 145
                                     Scottsdale, AZ  85254
                                     Telephone:    (480) 348-6400
                                     Facsimile:    (480) 348-6415
                                     Email:  hlr@zimmreed.com

Jason J. Thompson (P47184)
SOMMERS SCHWARTZ, P.C.
2000 Town Center, Suite 900
Southfield, Michigan 48075
Telephone:     (248) 436-8448
Facsimile:     (248) 436-8453
Email:  jthompson@sommerspc.com

Timothy J. Becker, MN Bar No. 256663
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
Telephone:     (612) 341-0400
Facsimile:     (612) 341-0844
Email:   tjb@zimmreed.com

**Counsel for Plaintiff Jane Doe**

### CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2009, I served the foregoing MEMORANDUM IN OPPOSITION TO DEFENDANTS DÉJÀ VU CONSULTING, INC.'S AND HARRY V. MOHNEY'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Jason J. Thompson, Hart L. Robinovitch, Timothy J. Becker, Walter J. Piszczatowski, Edith A. Thomas, Kristin Beals Bellar, Ronald A. King, and Paul W. Coughenour.

By:     /s/ Stacy A. Bethea, CP
Stacy A. Bethea, C.P.
Certified Paralegal
ZIMMERMAN REED, PLLP
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ  85254
Telephone:     (480) 348-6400
Facsimile:     (480) 348-6415
Email:  sab@zimmreed.com

31