```
1

2                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
3                         SOUTHERN DIVISION

4     JANE DOE,

5                  Plaintiff,            Case No. 08-cv-12719
        -v-
6
      CIN-LAN, INC., et al.,
7
                   Defendants.
8     _____/

9                          MOTION HEARING

10         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                    United States District Judge
11          Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
12                      Detroit, Michigan
                   Thursday, August 13, 2009
13
      APPEARANCES:
14
      FOR THE PLAINTIFF:    MR. JASON THOMPSON
15                          Sommers Schwartz

16                          MR. HART L. ROBINOVITCH
                            MR. TIMOTHY J. BECKER
17                          Zimmerman Reed

18    FOR THE DEFENDANT:    MS. EDITH THOMAS
      (Harry V. Mohney)     Attorney at Law
19
      (Deja Vu              MR. PAUL W. COUGHENOUR
20    Consulting)           Clark Hill

21
           Also Present:  Mr. Nicholas Nelson, Law Clerk
22
           To Obtain a Certified Transcript Contact:
23      Karen M. Klerekoper, CSR, RPR - (313)962-1119

24

25
```

TABLE OF CONTENTS

_____

| IDENTIFICATION | PAGE |
| --- | --- |
| Argument by Ms. Thomas............................. | 6 |
| Argument by Mr. Coughenour......................... | 11 |
| Argument by Mr. Thompson........................... | 13 |
| **CERTIFICATE OF COURT REPORTER**...................... | 18 |

1  Detroit, Michigan

2  August 13, 2009

3  2:00 p.m.

4                    *     *     *

5

6           (Call to Order of the Court)

7           MR. NELSON:  The Court calls case number

8  08-cv-12719, Jane Doe versus Cin-Lan, Incorporated.

9           THE COURT:  Okay.  Good afternoon, everybody.

10 You may be seated.

11          This is a case I'm very familiar with.

12 Mr. Thompson, how are you today?

13          MR. THOMPSON:  I'm fine, thank you, Your Honor.

14 How are you?

15          THE COURT:  I'm great.  Who is here?  Ms. Thomas?

16          MS. THOMAS:  Good afternoon.

17          THE COURT:  And your name is?

18          MR. COUGHENOUR:  Paul Coughenour, Your Honor,

19 from Clark Hill.

20          THE COURT:  Where is Mr. Piszczatowski?

21          MS. THOMAS:  Cin-Lan did not join this motion.

22          THE COURT:  He is only in it for Cin-Lan then?

23          MS. THOMAS:  Yes.

24          THE COURT:  Okay.  The issue, which I met with

25 Mr. Piszczatowski and Mr. Thompson about informally some

1    time ago, deals with the status of Deja Vu Consulting,

2    Incorporated and Harry V. Mohney as employers of plaintiff

3    Jane Doe.  We thought it was a prudent strategy after that

4    brief status conference, which I greatly appreciated by the

5    way, to provide for discovery on the business relationships

6    of Deja Vu Consulting, Incorporated and Harry Mohney

7    vis-a-vis Cin-Lan, the nightclub in Lansing or East

8    Lansing, where Ms. Doe was or is employed, and to determine

9    whether or not those business relationships would justify

10   finding them to be employers of Ms. Doe.

11           The theory being why not determine the employment

12   or employer status of those individuals and entities before

13   we go to class certification and determine who is going to

14   be a defendant and who is not.  So I thought that was a

15   good way to go at things.

16           Having had that opportunity and now some time has

17   passed, apparently discovery has been conducted and Deja Vu

18   and Mohney have filed a motion -- or separate motions I

19   should say -- for summary judgment claiming that they are

20   not employers within the meaning of the Federal Fair Labor

21   Standards Act, 29 USC section 201, et cetera, as well as

22   Michigan's Minimum Wage Law from 1964.

23           My standard of review here on a Rule 56 motion,

24   as I see it, is we need to determine the facts from

25   discovery as to whether or not Deja Vu Consulting,

1    Incorporated and Harry V. Mohney will be considered to be

2    employers, and then I decide as a matter of law whether or

3    not they are, and that's my simple job.  Simple job is made

4    complex by what I have in front of me and I think what is

5    blown up in front of me is a rather large corporate

6    structure that leads to the employment of Jane Doe.

7           I would just note a couple of things for the

8    record.  I don't find this to be a complex issue.  I think

9    Mr. Mohney and the corporate entities, as well as Krontz,

10   St. John, and the people that are employed by them, are

11   engaged in a rather significant shell game here, possibly

12   aimed at avoiding liability in cases like this, who knows?

13   *Reich versus Circle C Investments, Incorporated,* a Fifth

14   Circuit Case from 1993, makes plain that an individual who

15   does not have an ownership interest in strip-club

16   operations, does not control the day-to-day operations of

17   those companies but only manages to be a consultant, even

18   in the face of exclusion of personnel matters from

19   responsibilities, does not mean that the individual does

20   not exercise control or does not suffer liability in a FLSA

21   situation.

22          This is a Rule 56 motion so we have to look at

23   everything that is said in the light most favorable to the

24   nonmoving party, Jane Doe, and I just don't see how setting

25   up, you know, Cin-Lan Incorporated, which is owned by

1   Imagination Incorporated, which is owned by the Harry
2   Mohney Trust, which is the sole -- Harry Mohney being the
3   sole trustee and beneficiary, gets Mr. Mohney out of
4   liability under the FLSA, under, you know, potential tax
5   issues, or for whatever reason he may have set these
6   companies up.
7            I would also say, we are here looking at Rule 56
8   matters and I don't see how the plaintiff can be taxed with
9   properly opposing this when Mohney has not turned over
10  e-mail documents.  When there is lack of correspondence
11  between the trustees, lack of correspondence -- one of the
12  most outrageous things I read is that Mohney says under
13  oath in a deposition that he cannot locate most of the
14  memos he sent to various Deja Vu nightclubs because his
15  16-year-old son had destroyed his computer.
16           All right.  This is ridiculous.  If you want to
17  take time and argue you go ahead, but I can tell you pretty
18  much how I'm going to decide this.  Okay?  Anything?
19           MS. THOMAS:  I would prefer to argue.
20           THE COURT:  Go ahead.  You can try to change my
21  mind, but I think this is completely ridiculous.
22           MS. THOMAS:  Well, I think the first thing, Your
23  Honor, is that what the plaintiffs want to do by showing
24  this corporate structure is convince the Court that an
25  enterprise is enough and is the same as a joint employer.

1   And what the testimony has been, which the plaintiffs
2   simply don't believe, is that Mr. Mohney doesn't engage in
3   matters that each of these cases set forth, which is
4   actually being involved in hiring and firing, setting the
5   standards of employment, looking at time records, setting
6   compensation, looking at schedules, those kind of things.
7   And if you go through each of the cases, which I did one by
8   one, each of those cases has the kind of conduct, active
9   conduct, of an officer or owner engaging in
10  employment-related matters.
11          Now, they have shown the Court various facts
12  showing that Mr. Mohney looks at sales reports.  He has
13  written articles about how to read sales reports.  They
14  have no evidence whatsoever that he was involved in hiring
15  and firing and in terms of the case that you noted, which I
16  believe is *Circle C*, that person who was a consultant for a
17  nightclub like this, close reading of the case shows that
18  he actually hired waitresses, he was on the premises, he
19  engaged the staff concerning hours of operation and the
20  hours of workers.
21          He was present there, which Mohney has not been
22  placed as being present, and although I understand that the
23  Court is viewing this as sort of a whole nefarious scam
24  of -- I can't remember the word that you used, but
25  shuffling around corporations.

1            THE COURT:  I called it a shell game.

2            MS. THOMAS:  A shell game.

3            THE COURT:  Yeah, I called it an effort to avoid

4    liability by setting up a bunch of corporations that

5    separate the individual from those types of acts that you

6    are citing from the cases, and I think that that is going

7    to have to be explored by the plaintiffs further at the

8    minimum, and I also find that, how in the world do I know

9    whether or not he did the sorts of things that you say

10   *Circle C* requires him to do to rise to the level of

11   liability without even having looked at e-mail

12   correspondence because his son, who is 16, destroyed his

13   computer, because there is no correspondence turned over

14   between the trustees, because you raise eight or nine

15   objections to each interrogatory that Ms. Doe files.  I

16   just do not see that we are going to let Mr. Mohney and

17   Deja Vu Consulting, Incorporated out at this juncture in

18   the blind of night with this sort of structure that has

19   been, in my view, put in place to avoid the type of

20   liability which Ms. Doe wants to attach to him.  It's that

21   simple.

22           MS. THOMAS:  And just to speak quickly as to the

23   discovery issue, the plaintiffs had five months to do

24   discovery.  They have never done a motion to compel.  We

25   have repeatedly offered to meet and confer with them.  We

1   have offered them to pick up the expense of looking through

2   computers for e-mails, and they have never responded to any

3   of those things, nor have they ever done a motion to

4   compel.

5           So, for the plaintiffs to come in response to the

6   motion for summary judgment and say, well, we didn't get

7   information, they have had five months to get that

8   information.

9           THE COURT:  Okay.  That's fair.  That's fair.

10  And if you two get together and you come up with

11  information and you put together a complete record, and it

12  looks like I'm wrong and you are right and Mr. Mohney had

13  nothing to do with this outfit, then there is nothing

14  further the plaintiffs can do to show that he did, I would

15  entertain a renewed motion and dismiss the case as to

16  Mr. Mohney.

17          But based on what I have seen here, my conclusion

18  is the opposite, that nothing but one level of complexity

19  after another has been added to the corporate structure to

20  separate the -- I mean, my understanding is there is a guy

21  in the deposition testimony who was asked, you know, what

22  is his value as a consultant, 2500 -- $25,000 a year?  No,

23  he is worth a million dollars a year.

24          You know, I mean, it seems to me like this

25  individual controls the purse strings and the knowledge of

1    what goes on out there.  If that's not true, fine, then we

2    can look at that, but from what I've seen here, I'm not

3    able to say it's not.

4            MS. THOMAS:  Right.  And I understand that those

5    things may be true.  But I don't think they go to the joint

6    employer issue.  And the other comment I want to make is,

7    when you say that this shell game is used to avoid

8    liability, Cin-Lan has conceded that it is subject to FLSA

9    jurisdiction.  It has a sufficient number of employees, it

10   has sufficient income.  So no one is evading liability.

11           What these cases have to do with is, particularly

12   the enterprise theory, is coverage, and the plaintiffs who

13   worked at Cin-Lan are definitely covered by the FLSA and

14   there is no question about that.  So that would not be a

15   fair assessment that they are using this to avoid

16   liability.

17           THE COURT:  Okay.  All right.  Very good.  Thank

18   you.  Anything else?  Thank you very much.

19           Mr. Coughenour?  Is that --

20           MR. COUGHENOUR:  Yes, it is, Your Honor.  I have

21   something very brief to add.

22           THE COURT:  Good.

23           MR. COUGHENOUR:  Good on the brief part, I

24   assume?

25           THE COURT:  Right.

1      MR. COUGHENOUR:  Your Honor, simply this, let's
2  assume for a minute that that chart is accurate, and even
3  what you have said is accurate, which it may well be that
4  this corporate structure was designed for some purpose,
5  what we would then have is basically what a parent
6  corporation has over its subsidiaries.  Fine.  They are all
7  related or perhaps part of the same enterprise, if what you
8  are saying is correct, or what the plaintiffs are saying is
9  correct, but that still -- there is still a distinction to
10 be made between that issue and liability and to me, Your
11 Honor, I think the Court -- I would like the Court to focus
12 on that part of the FLSA that requires a showing of how in
13 this case, Consulting, because that's the client I'm
14 representing, acted in the interest of the employer, which
15 would be Cin-Lan, in relation to the employee, which is
16 argued to be the plaintiff.
17     And that's all.  I -- I have looked at the
18 record.  I have come into this somewhat late.  I have read
19 the deps and all the documents.  I don't see where there is
20 anything in the record that Consulting did in the interest
21 of Cin-Lan in relation to Jane Doe, and that's the
22 statutory requirement and no matter how interconnected or
23 spaghetti-like these corporate structures are, if
24 Consulting did not take actions in respect or in relation
25 to Jane Doe, it's not a joint employer under the FLSA.

1          And the only other thing I would add on Michigan

2     Wage Law, Your Honor, it's interesting to me, there is a

3     distinction here between, you know, the statutory

4     definition and the FLSA and the Minimum Wage Law and the

5     Minimum Wage Law includes or incorporates a requirement

6     that the employer designate the work site or have the

7     employee work at a fixed work site.

8          So my argument to this Court is simply that there

9     is no showing Consulting did that with respect to Jane Doe,

10    therefore, under the Michigan Minimum Wage Act, it cannot

11    be her employer.

12         THE COURT:  All right.  Thank you very much.

13         MR. COUGHENOUR:  I'm sorry.  I should --

14         THE COURT:  No, no, that's fine.  I just have a

15    brief comment, which you can sit right down, that's fine.

16         I guess I see Deja Vu Consulting, Incorporated

17    closer to the case than Mohney is.  I think that Sime

18    oversaw Cin-Lan's day-to-day operations, that he had

19    authority how the club would function and treat the

20    employees and that this fellow Krontz, that I mentioned

21    before, who was president of Cin-Lan and was virtually

22    indistinguishable from his employment as a consultant with

23    Deja Vu and, obviously, she would be an employee of Cin-Lan

24    and Deja Vu could be considered as an employer of all of

25    Cin-Lan's employees, but I will keep an open mind and I

1   will look closely at the issue brought to bear, which is

2   whether or not Deja Vu has a requisite connection under the

3   FLSA with Ms. Doe.

4               MR. COUGHENOUR:  Thank you, Your Honor.

5               THE COURT:  Now, let me say this to Ms. Thomas

6   and Mr. Coughenour -- it's not a personal issue -- I read

7   your briefing and your briefing was excellent and

8   comprehensive and clear.  I just think you represent

9   clients who, you know, found themselves, at least with me,

10  in a -- in a tough spot.  I think we need to -- we need to

11  go further with some factual developments, see what

12  develops and see where they go.

13              If I, indeed, deny your motion, I will issue an

14  order and I will make it plain that you are free to renew

15  it when more of the facts that I'm concerned about would

16  come up.

17              So you can say something if you want,

18  Mr. Thompson.  I doubt that you need to but it's entirely

19  up to you.

20              You are going to do it anyway, aren't you?

21              MR. THOMPSON:  I'm only going to make two points.

22  One is to tell you last week I was over in the Western

23  District arguing a motion for a protective order and the

24  defense counsel and Magistrate Judge Scoville were having a

25  heated exchange and I stood up at the table and got geared

1   up and ready to respond to all of the arguments and
2   Magistrate Judge Scoville looked at me and said, is there a
3   reason you are standing up?  So I will take that cue and
4   not address much of anything here today because I think
5   Your Honor has a good grasp of things.
6              I would ask, though, that we address what we do
7   next.  As you indicated when you first took the bench, the
8   whole purpose of the last six month has its genesis in
9   defendants' objections to many of our discovery requests on
10  the grounds that this was never going to extend beyond the
11  Cin-Lan Club in Lansing and it certainly shouldn't involve
12  any class issues.  I'm just not quite sure at this point
13  what Your Honor would like us to do.  Should we have
14  another meet-and-confer after we get your order and decide
15  what we should do next in terms of discovery?
16             THE COURT:  I think the number one thing to do is
17  to let me revisit everything that I have read and consulted
18  with my staff about, especially my law clerk, Mr. Nelson
19  here, and make sure I issue an order that resolves a
20  summary judgment motion.
21             After that, it seems to me you will have a case
22  with anywhere from one to three defendants, a plaintiff
23  with a putative class action, and if I'm not mistaken, our
24  goal -- or at least our idea was to then take off in the
25  direction of discovery on the class issues.  So I assume

1   that's where we go next.  But let me look at the file and
2   go a little further in terms of resolving this motion.  And
3   if we need to have a status conference to decide a
4   discovery plan or any other dates, we will go with that.  I
5   didn't look at the scheduling order before I came out here,
6   just so you know.  So that would be my answer to your
7   question.
8           Anything else you want to say?
9           MR. THOMPSON:  Thank you.
10          THE COURT:  Thank you very much.
11          Let me just say this:  We are flying very quickly
12  around here right now for a number of different reasons,
13  including the fact that my friend Mr. Nelson is, you know,
14  with my pride and joy, going up to the Third Circuit next
15  year.  We issued an order earlier this week.  I think we
16  probably struck some matters without reading the record as
17  carefully as we could have, and we cleaned that up as
18  quickly as possible.  But I am not shy to say to you that
19  was a mistake.  I apologize for doing that.  But we got the
20  right order issued I think an hour later, so I did want to
21  say that.
22          Other than that, I think we are -- we all know
23  where we are at.  I will issue an order within the next 15
24  days.  And we will go from there.  Okay?
25          MR. COUGHENOUR:  Your Honor, may I address just

1   one more thing?

2          THE COURT:  Yes.

3          MR. COUGHENOUR:  The subject of mistakes, I'm

4   sorry I should have done this earlier.  I gave a copy -- as

5   I read the deposition of Jim St. John, it's struck me that

6   some of the testimony was improperly reported.  We

7   contacted the court reporter.  She indeed said this is the

8   case.  I quoted an answer of Mr. St. John when it was

9   Robinovitch's question.  She sent today the corrected copy

10  of the transcript page.

11         May I submit that?

12         THE COURT:  Absolutely.

13         MR. COUGHENOUR:  For the record, quoted on pages

14  8 and 9 of the plaintiff's brief, obviously, they weren't

15  aware of the misreporting.

16         THE COURT:  Absolutely.  It's too bad Karen

17  Klerekoper is not in private practice anymore.  She

18  wouldn't have made that mistake.

19         THE COURT:  We are in --

20         MR. THOMPSON:  Before we --

21         THE COURT:  Go ahead.

22         MR. THOMPSON:  In light of that correction that

23  was just brought to our attention, I would like to cite to

24  the Court, Plaintiff's Exhibit 3, which is the deposition

25  of Donald Krontz on page 104, for the simple fact that the

1    whole sum and substance of the misquoted deposition

2    testimony is again repeated on page 104.  Any value that we

3    had associated with the misquote is entirely consistent

4    with page 104, Mr. Krontz's deposition.  I just want to

5    note that.

6             THE COURT:  Good.  So we are all on the same

7    page, at least you guys are.

8             All right.  Have a good weekend.  Thank you, and

9    we are in recess.

10            MR. NELSON:  All rise.  Court is adjourned.

11

12            (Proceedings adjourned at 2:24 p.m.)

13                        *     *     *

1
2
3 **CERTIFICATE OF REPORTER**
4           As an official court reporter for the United
5 States District Court, appointed pursuant to provisions
6 of Title 28, United States Code, Section 753, I do hereby
7 certify that the foregoing is a correct transcript of
8 the proceedings in the above-entitled cause on the date
9 hereinbefore set forth.
10
11
12                  s/ Karen M. Klerekoper
13              KAREN M. KLEREKOPER, CSR, RPR
14                  Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25